JORDAN LEVY & another[1] *vs.* THE ACTING GOVERNOR
& another.[2]

Suffolk. March 4, 2002. - May 7, 2002.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Governor. Massachusetts Turnpike Authority. Commonwealth,* Officers and employees. *Words,* "Cause."

This court, in reviewing the decision of the Governor to remove two members of the Massachusetts Turnpike Authority, an essentially independent authority, for alleged fiscal irresponsibility, applied a "substantial evidence" standard of review. [745-748] CORDY, J., with whom MARSHALL, C.J., and SOSMAN, J., joined, dissenting.

Because the Governor had no supervisory, managerial, or proprietary interest in the Massachusetts Turnpike Authority (Authority), the Governor's powers over the Authority did not include the power to remove its members for any reason advanced in good faith and honest judgment, or an honest dispute over policy, but rather, in order to preserve the Authority's independence, "cause" to remove a member had to be in the order of malfeasance, misfeasance, or wilful neglect of duty, the standard of removal applicable to comparable independent authorities. [748-749]

This court vacated the Governor's order of removal of two members of the Massachusetts Turnpike Authority for alleged fiscal irresponsibility, where the decision to remove was not supported by substantial evidence. [749-752] CORDY, J., with whom MARSHALL, C.J., and SOSMAN, J., joined, dissenting.

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on November 19, 2001.

Following review by this court, 435 Mass. 697 (2002), the case was reported by *Greaney,* J.

*Paul W. Johnson* for Jordan Levy.

*Richard J. Hayes* for Christy Peter Mihos.

*Thomas A. Barnico,* Assistant Attorney General (*Richard S. Weitzel,* Assistant Attorney General, with him) for the Acting Governor.

[1]Christy Peter Mihos.

[2]Secretary of the Commonwealth.

SPINA, J. Following our decision in *Levy* v. *Acting Governor*, 435 Mass. ·697, 707 (2002), the Governor held a hearing to determine whether Jordan Levy and Christy Peter Mihos should be removed as members of the Massachusetts Turnpike Authority (Authority), for cause, pursuant to G. L. c. 30, § 9. On February 6, 2002, the Governor determined that they should be removed immediately. Levy and Mihos sought review in the nature of certiorari, pursuant to G. L. c. 249, § 4, in the county court. A single justice reserved and reported the matter to the full court. Levy and Mihos contend that (1) the reasons given for their removal are insufficient as ·matter of law to establish "cause"; (2) the decision to remove them is not supported by "substantial evidence"; (3) the decision to remove them was arbitrary and capricious, and based on bias; (4) they were denied procedural due process at their hearing; and (5) their removal violated principles of free speech under the First Amendment to the United States Constitution.[3] We conclude that the dispute involves a difference of opinion over policy that, in the circumstances, does not constitute substantial evidence of cause to remove, and we vacate the order on that basis.

1. *Background.* In 1995, by St. 1995, c. 102, § 13, as amended by St. 1995, c. 273, § 1, the Legislature authorized the transfer of the Ted Williams Tunnel to the Authority, required the first ($100 million) of many financial contributions from it for the purpose of paying the Commonwealth's share of the Central Artery project (project), and directed that the Authority and the Executive Office of Transportation and Construction (EOTC) undertake a joint feasibility study (study) for the purpose of recommending the establishment of a structure to finance and then to operate the extensive network of infrastructure that would exist after the completion of the project. The study was completed in December, 1996. Before its recommendations were finalized, and because of the political volatility of decisions about tolls, the chairman of the Authority met with the Governor and legislative leaders to discuss the need to raise tolls to meet some of the financing requirements of the

---

[3]Mihos reserved his right to present his First Amendment claim to the United States District Court for the District of Massachusetts. See *England* v. *Louisiana Bd. of Med. Examiners*, 375 U.S. 411 (1964).

project. A consensus was reached that the Authority would raise tolls on the newly named metropolitan highway system[4] (MHS) tunnels to two dollars in 1997, and, in January, 2002, would raise the toll on the MHS Boston extension from fifty cents to one dollar, and on the MHS tunnels from two dollars to three dollars. It was also anticipated that the Ted Williams Tunnel connection to the Boston extension of the turnpike would be completed by 2002, thus permitting turnpike travelers direct passage to Logan Airport.

The study led directly to the passage of St. 1997, c. 3, which created a new enabling statute for the Authority (G. L. c. 81A). St. 1997, c. 3, § 6. The changes to the Authority embodied in c. 81A were significant. Its highway assets were divided between the western Massachusetts turnpike and the MHS. The Authority was authorized to take possession of the project's facilities when they were completed, to incorporate them into the MHS, and to enter into an agreement with the Commonwealth assuming management responsibility for the construction of the project. A management agreement was executed in July, 1997, and among the many responsibilities assumed by the Authority was the responsibility for preparing and filing an annual "Finance Plan" with the Federal Highway Administration (FHA), setting forth the sources of revenue on which the Commonwealth was relying to pay its projected share of the increasing costs of the project.

In 1997, following the recommendations of the study, the Legislature required the Authority to pay $700 million toward the cost of the project. St. 1997, c. 11, § 61 (*b*). To make this payment, the Authority sold its first MHA bonds (1997 offering). In 1998, the Legislature amended G. L. c. 81A, § 12, to authorize the Authority and the Executive Office of Administration and Finance (EOAF) to enter into a long-term funding agreement for the operation and maintenance of the project's facilities once they were transferred to the Authority. The agree-

---

[4]The "[m]etropolitan highway system," defined in G. L. c. 81A, § 3, includes the "Boston extension" of the turnpike, the "Callahan tunnel," the "central artery," the "central artery north area," the "Sumner tunnel," the "Ted Williams tunnel," and other "components as the general court may from time to time determine."

ment, executed in February, 1999, provided for the payment of up to $1 billion by the Commonwealth to the Authority for these purposes, over a forty-year period. On the execution of this agreement, the Authority entered into a revised memorandum of understanding with the EOAF and the EOTC in which the Authority agreed to pay an additional $555 million toward the project's costs. To make this payment, the Authority sold additional MHS bonds (1999 offering). This additional contribution of Authority funds was necessary to meet the financial commitments contained in the finance plan for the project, which the Authority had submitted to the FHA in October, 1998.

As the project's costs continued to spiral upward through the year 2000, the Legislature required the Authority to pay $200 million into an infrastructure fund for the purpose of meeting these rising costs. St. 2000, c. 87, § 11. In addition, the Authority identified other sources of its own funds and assets that would be available to pay the Commonwealth's share of these costs in the finance plan which it submitted to the FHA in September, 2000, and August, 2001. Specifically, the Authority committed to using $185 million from the sale of its "Allston Landing" properties to Harvard University, $68 million in proceeds from the sale of other parcels, and, more generally, future revenue from the Authority's real estate assets, to meet the increasing costs of the project.

Included in the prospectuses issued for the 1997 and 1999 MHS bond offerings, as well as in the Authority's annual reports (prepared pursuant to its continuing disclosure obligation undertaken at the time of those offerings), were revenue projections based on assumed toll increases including the toll hikes planned in 1996 for January 1, 2002. There is, however, no covenant requiring the Authority to make these toll increases. The January, 2002, hikes were identified as the source of $60 million in annual additional revenue. This additional revenue was described as necessary to cover an increase in the Authority's net debt service costs from $5 million per year in

2001 and 2002 to $76 million[5] per year in July, 2003, while maintaining various required debt service to revenue ratios, surpluses, and reserves. Each of the prospectuses included an updated toll study verifying the revenues which were projected to come from the toll increases.

These toll studies were in turn based on a number of stated assumptions, including:

A. The scheduled January, 2002, increase in tolls;

B. The completion of the connection between the Ted Williams Tunnel and the Boston extension of the MHS in 2002; and

C. That "normal economic conditions will prevail in the Boston metropolitan area, Massachusetts and the United States, i.e. there will not occur a severe recession, depression or national emergency."

The last two assumptions failed, the effect of which has been fewer automobiles on the Authority's roadways and therefore less toll revenues than projected. The Ted Williams Tunnel connection is not complete because of construction delays resulting from unforeseen and major water problems; and the economic downturn of the late 1990's was exacerbated by the terrorist attacks of September 11, 2001.

Levy and Mihos, who were appointed members of the Authority in 1998, had voted to approve the issuance of the 1999 MHS bonds, and the related prospectus, and were briefed at that time and on several occasions in 2001 regarding the background to the scheduled toll increases and the challenges faced by the Authority in meeting all of its necessary financial obligations.

In early August, 2001, pursuant to G. L. c. 81A, § 4 (*j*), the Authority held two public hearings regarding the proposed toll

---

[5]This increase is largely the result of the Authority's ability to offset its 2000 and 2001 debt obligation with $40 million in interest which it would earn on funds it had borrowed through the offerings but had not yet expended. The balance of those funds would be expended by 2002, leaving a substantially larger *net* debt service payment becoming regularly due. However, the anticipated $60 million per year from the anticipated toll increases would be available to be applied to this debt service in July, 2003, a point stressed by Levy, who questioned the need to collect eighteen months of toll increases for application to twelve months of debt, especially where other revenues also would be available to pay that debt.

increases for January, 2002. Testimony was presented challenging the need for the toll increases and the inequity of the existing toll structure. Several Massachusetts legislators urged the Authority to defer the toll increases and look for alternative solutions to repay the Authority's debt.

Shortly after the hearings ended, Levy asked members of the Authority's staff for information about alternative revenue sources, including reinstating tolls at interchanges one through six and sixteen, and eliminating resident and volume discount programs. On October 10, 2001, Mihos asked staff members for information concerning the status of the proceeds from the sale of the Allston Landing property, which had been placed in an account the previous year. In addition, Levy and Mihos received the opinion of the Authority's general counsel, as well as independent bond counsel, that the 1997 and 1999 trust agreements and bond prospectuses did not require tolls to be raised on January 1, 2002, and that deferring the toll increase until July 1, 2002, would not have a material adverse impact that would require disclosure under securities laws.

The toll covenant in the trust agreements does not require any specific toll increase. It merely requires the Authority to maintain certain debt coverage ratios. The ratio applicable here is 1.2:1. Bond counsel further advised that the Authority had cash reserves sufficient to avert a deficit until 2004 if there were no increase in tolls. Paul Ladd, the Authority's chief financial officer, advised Levy and Mihos to approve the toll increase effective January 1, 2002, and cautioned that a six-month delay in the toll increase, *without more*, would produce a deficit in 2004. Bond counsel, who had attended the public hearing on August 7, 2001, opined that the rating agencies would be receptive to alternative revenue plans.

At the meeting of the Authority on October 30, 2001, three legislators spoke against the proposed toll increase. Levy and Mihos voted to approve the toll increase effective July 1, 2002, "and further that the Authority staff study and report back . . . on (1) instituting an austerity program producing significant operating budget cuts; (2) deferring [Authority] capital expenditures for two (2) years which will yield twenty (20) million dollars per annum; (3) earmarking $30 million from the

proceeds of the Allston Landing sale to bolster and enhance revenues (with interest, proceeds are currently $164 million and they will not be utilized until 2004, 2005, and 2006); (4) offering 8 RFPs [Requests for Proposals] over the next four (4) months for the development of properties which will yield significant non-toll revenues (one such RFP is the former interchange 16 toll in West Newton, and should such RFP offers due on [December 15, 2001,] not yield critical value, thereafter, the Authority shall reopen the interchange to transponder transactions only); (5) eliminating the commercial volume discount; (6) reinstating tolls at interchanges one through six; (7) working with the Legislature and the Administration to cap the resident discount program; (8) working with the Legislature and the Administration to look at tolling Interstate. [Route] 93; (9) working with the Legislature to require the [Massachusetts Bay Transportation Authority] to pay tolls for their buses and vehicles; and further that the [Authority] shall receive a report on all of these issues within 30 days and every 30 days thereafter for [its] consideration and decision." Chairman David Forsberg voted against the motion. The Authority then voted unanimously to eliminate the volume discount program for commercial vehicles, effective December 31, 2001.

Bond counsel, who had attended the October 30 meeting, indicated that she did not foresee any problem with the rating agencies because the members voted for toll increases to begin on a date certain and because the members had identified additional sources of revenue that they would examine within thirty days.

On November 5, 2001, Levy and Mihos met with staff and discussed various options, most of which had been identified during the months between the August hearings and the October 30 meeting in response to requests by Levy and Mihos. Levy, Mihos, and the staff reached a consensus that the Authority could produce approximately $38.4 million in net revenues to make up for the estimated $30 million lost by the six-month delay in toll increases. This included deferrals in capital expenditures until 2004 and 2005 that staff had assured would not compromise public safety. After the meeting, Paul Ladd made it known that he was unhappy about the course that Levy and Mihos were taking.

Levy and Mihos requested that Forsberg place on the agenda for the next meeting of the Authority a motion incorporating those matters on which a consensus had been reached with staff at the November 5, 2001 meeting, including proposals to "(A) re-instate tolls on interchanges 1, 2, 3, 4, 5, 6 ($13 mil. estimated annual revenues), interchange 16 ($2.4 mil. estimated annual revenues), and interchange 17 in accordance with the Authority's enabling legislation; (B) defer $12.6 mil. of the Authority's MHS capital improvement budget for 2002 with about $18.5 mil. remaining in the MHS capital improvement budget for 2002; (C) defer $6.4 mil. of the Authority's MHS capital improvement budget for 2003 with about $15.4 mil. remaining in the MHS capital improvement budget for 2003; (D) defer $4.0 mil. from the turnpike capital improvement budget for 2002 with about $27.3 mil. remaining in the turnpike capital improvement budget for 2002; (E) issue RFPs for the sale of real estate assets; (F) identify and authorize the transfer of supplemental revenues of the turnpike and transfer such supplemental revenues to the MHS; [and] (G) explore additional revenue generation from other facilities, including the parcel 7 garage."

On the evening of November 5, 2001, the Governor tele-phoned Mihos at home and requested his resignation. Mihos declined. On November 9, Levy and Mihos called for a special meeting of the Authority for November 13. Following discus-sions with the Governor's chief legal counsel, it was agreed that no votes on certain matters, including tolls, would be taken at the November 13 meeting, and that votes on those certain mat-ters would be deferred until November 16 at 10 A.M. so that the members could meet with the Governor's representatives to discuss toll increases and other matters. Meetings were scheduled for November 14 and 15. On November 14, Levy and Mihos were advised by a Governor's representative that Paul Ladd was not in attendance because he was in New York at a meeting with one of the Authority's rating agencies, Fitch IBCA. It was later learned that he had met with representatives of Moody's Investors, Inc., another rating agency, on November 8, and that he had disclosed to both rating agencies that the Author-ity had voted on October 30 to delay implementation of

anticipated toll increases until July 1, 2002, but that he had not disclosed that the Authority also voted for the development of alternative revenue sources. Ladd had also failed to disclose the efforts undertaken at the November 5 staff meeting to develop those sources. No one from the Governor's office attended the scheduled November 15 meeting.

On November 15, 2001, as a result of its meeting with Ladd the week before, Moody's affirmed its rating of the Authority's bonds, but changed its credit outlook from "stable" to "negative." On November 30, Fitch placed the MHS bonds on a negative credit watch, the mildest form of adverse report. These reports were made without benefit of any details of the alternative revenue developments undertaken by the Authority. The Fitch report gave as one basis the "political" challenge resulting from the Governor's involvement.

The meeting of the Authority proceeded as scheduled on November 16, 2001. Forsberg announced that the Governor had just informed him that she was removing Levy and Mihos, and that a quorum did not exist on which a meeting could take place. General counsel advised Levy that the meeting could proceed. Forsberg did not participate. Levy and Mihos voted to approve the items on the agenda, including the alternative revenue plan devised on November 5, revised to require a study of the tolls on interchanges one through six, and implementation of a revised commercial rate structure on the MHS.

On February 6, 2002, after a two-day hearing, the Governor notified Levy and Mihos of her decision to remove them for cause, pursuant to G. L. c. 30, § 9, effective immediately. She concluded that their "acts and omissions concerning the Authority's finances, particularly during the time period culminating with the Authority's October 30, 2001[,] [b]oard meeting and immediately thereafter, were fiscally irresponsible, resulting in adverse consequences of substantially decreasing projected revenues of the Authority, damaging the Authority's credit outlook, and creating financial instability." She found that, despite being "repeatedly advised by the Authority's financial staff . . . of the Authority's tenuous financial condition, including the depletion of cash reserves in the near term and the need for additional revenue to meet its considerable

financial obligations . . . [they went ahead nonetheless, and] . . . forfeited substantial revenues and further compromised the Authority's financial stability." The Governor found that Levy and Mihos "acted in a manner contrary to . . . stated assumptions" in the 1999 MHS bond prospectus, resulting in "negative actions by bond rating agencies to the detriment of the Authority, potentially compromising the largest public works project in the nation."

The Governor found that the alternative revenue plan was created "hurriedly" and in a "haphazard" manner, that it did not adequately compensate for the revenues that had been lost as a result of their actions, and that it was not financially viable. She also specifically rejected Levy's and Mihos's contention that the events of September 11, 2001, and the delay in opening the Ted Williams Tunnel justified their failure to take advantage of the revenue opportunity in the form of a toll increase beginning January 1, 2002. Although the Governor found that these acts and omissions, standing alone, "constituted cause for [their] removal," she identified several additional, independent grounds justifying removal.

The Governor further determined that Levy and Mihos "interfered with the effective daily management of the Authority" by "dividing the staff," "refusing to follow normal lines of authority," "micromanaging matters within the purview of the Authority's professional staff," and by "creating an environment within the Authority that was not conducive to productivity." She also found basis for removal in actions they took that "further jeopardized the Authority's standing with the rating agencies, without consulting with the Chief Financial Officer or disclosure counsel."

2. *Standard of review.* Levy and Mihos argue that the standard of review we should apply here is the "substantial evidence" test. "Substantial evidence" is evidence that "a reasonable mind might accept as adequate to support a conclusion." G. L. c. 30A, § 1 (6). The Governor argues that the "arbitrary and capricious" standard should apply because her decision is entitled to considerable deference, and the nature of her decision is executive, not judicial. We have said that "the proper approach in considering the appropriate scope of review [under

G. L. c. 249, § 4,] is to evaluate the nature of the action sought to be reviewed." *Boston Edison Co.* v. *Boston Redevelopment Auth.*, 374 Mass. 37, 49 (1977). Here, that action involves the removal of two members of an essentially independent authority by the Governor for alleged fiscal irresponsibility.

The cases relied on by the Governor involve the removal of public officials over whom an executive had broad supervisory or managerial responsibility and control, or oversight, or whose position existed to aid the executive in carrying out policies. See *McSweeney* v. *Town Manager of Lexington*, 379 Mass. 794, 800 (1980) (removal of town engineer and superintendent of public works by town manager for incompetence and inefficiency); *Dunn* v. *Mayor of Taunton*, 200 Mass. 252, 258 (1908) (mayor removed sewer commissioners for failure to comply with statute requiring imposition of sewer assessments); *Gaw* v. *Ashley*, 195 Mass. 173, 177 (1907) (removal of member of board of health by mayor); *Ayers* v. *Hatch*, 175 Mass. 489, 492 (1900) (removal of assessor by mayor). In such cases, "[i]f the cause assigned is a reasonable one, then, whether under the circumstances it is sufficient to justify a removal, is for the [executive] to decide and his decision is final." *Id.* The decision of the removing authority "can be revised by this court [under certiorari review] only when there has been an arbitrary exercise of power." *Dunn* v. *Mayor of Taunton*, *supra*. Where traditional models of executive oversight are involved, the less strict "arbitrary and capricious" standard of review should be applied. Where such oversight is absent, however, the public official, and perhaps others, have a greater interest in retention, so a higher standard may be more appropriate. See *Boston Edison Co.* v. *Boston Redevelopment Auth.*, *supra*.

The Governor's supervisory or managerial interest in the Authority is limited, and it does not extend to the activity at hand. See *Levy* v. *Acting Governor*, 435 Mass. 697, 705 (2002). The Authority was created as "a body politic and corporate," G. L. c. 81A, § 1, and as such it is "not part of the machinery of the government." *Commonwealth* v. *Toomey*, 350 Mass. 345, 350 (1966), quoting *Opinion of the Justices*, 334 Mass. 721, 739 (1956). General Laws c. 81A confers on members the power

to fix tolls (§ 10),[6] the power to issue notes and bonds (§ 5 [*g*]), and the power to employ necessary staff to carry out corporate policy (§ 4 [*s*]). The statute gives the Governor no authority to act in place of the members or to substitute her judgment for theirs in these areas. The members were not appointed to carry out the policies of the Governor, but the policies of the Authority as determined by themselves.

Notes or bonds issued by the Authority are not a debt of the Commonwealth, or a pledge of the faith and credit of the Commonwealth. Notes or bonds issued by the Authority are payable solely from revenues generated by the corresponding turnpike or metropolitan highway system. See G. L. c. 81A, § 4 (*g*), (*h*); § 5 (*i*). Noteholders and bondholders of the Authority cannot look to the Governor or the Commonwealth for payment. They can only look to the Authority. Thus, the Governor has no apparent proprietary interest in the Authority's issuance of bonds and notes.

The Legislature determined that the public would be better served by an independent Authority. The independence of the Authority is also essential to the Authority's lenders and investors. The 1997 and 1999 bond prospectuses describe the Authority as "a body public and corporate" able to "act only upon the concurrence of at least two of its members," and that only they "determine policies affecting the operation and maintenance of the [MHS] and the Western Turnpike." The only exception to this power mentioned in the prospectuses is legislative action. There is no reference in the prospectuses to the Governor's having any power to manage the Authority or

---

[6]Unlike G. L. c. 81A, § 10 (*a*), which confers power on the Authority to fix tolls over the turnpike, free from executive supervision, § 10 (*b*) simply confers power on the Authority to fix tolls for the MHS, with no reference to freedom from executive supervision. We do not think that this implies a legislative intent to confer supervision in the executive branch, because where the Legislature intended executive oversight of the Authority elsewhere in c. 81A, it did so explicitly. See, e.g., G. L. c. 81A, § 16 (land lease of forty years or more requires Governor's approval). The Governor, correctly, does not claim any power to fix tolls over the MHS. The 1997 and 1999 bond prospectuses indicate that the Legislature has retained such power for itself. As an example, the prospectuses cited St. 1997, c. 11, § 113, which fixed free passage on the western turnpike (interchanges 1 through 6) and the Boston extension.

fix tolls. The rating agencies also look to the independence of the Authority in the circumstances here, and they take notice when that independence is threatened. It is the independent judgment of the members that lies at the heart of this matter. Because the Legislature has determined that the public would be better served by an independent Authority that operates more like a business than a government agency, because lenders and investors have a need to be secure in the identity of management, because of the importance to the public, lenders and investors of an independent Authority free from the changing winds of politics, because of the need to preserve that independence, and because the Governor has no broad power of oversight of the Authority here, the "substantial evidence" test should be applied. Removal of a member of the Authority in the circumstances of this case is not a decision to which deference is accorded. Rather, it is a decision that must be given very close scrutiny.

3. *Cause.* Levy and Mihos contend that, because "cause" is not defined in G. L. c. 30, § 9,[7] it should be determined in light of their statutory powers and duties. They argue that "cause for removal should be measured against the statutory prerogatives and discretion, as well as the duties and responsibilities, of the position that they hold."

The Governor contends that § 9 permits her to remove Levy and Mihos "for cause including but not limited to misconduct, incompetence, neglect of duty, maladministration, or any act or omission that impairs the ability of the Authority to fulfill its public responsibilities." To these she adds any "grounds for discharge reasonably related, in the employer's honest judgment, to the needs of his business," *Amoco Oil Co. v. Dickson,* 378 Mass. 44, 48 (1979), quoting *G & M Employment Serv., Inc. v. Commonwealth,* 358 Mass. 430, 435 (1970), and even a dispute over policy "about which there may be an honest difference of opinion." *Rinaldo v. School Comm. of Revere,* 294 Mass. 167, 169 (1936).

---

[7]General Laws c. 30, § 9, states: "Unless some other mode of removal is provided by law, a public officer, if appointed by the governor, may at any time be removed by him for cause, and, if appointed by him with the advice and consent of the council, may be so removed with its advice and consent."

What constitutes "cause" to remove a member of the Authority should be determined in the context of the power of the Authority to act in the circumstances here as an independent corporate body. As noted above, the Governor has no supervisory, managerial, or proprietary interest in the Authority, except in limited circumstances not relevant here. It follows that the Governor's powers over the Authority do not include the power to remove its members for any reason advanced in "good faith and honest judgment," *Amoco Oil Co.* v. *Dickson, supra* at 45, or an honest dispute over policy. See *Rinaldo* v. *School Comm. of Revere, supra.* The Governor's good faith and honest judgment play no part in the instant matters affecting the Authority. The more flexible definition of "cause" that we apply in cases involving executive oversight of a governmental or corporate body is not appropriate where broad oversight is absent. In order to preserve the Authority's independence, a matter of utmost importance to the public, to bondholders, and to lenders, cause to remove a member should be in the order of malfeasance, misfeasance, or wilful neglect of duty, the standard of removal applicable to comparable independent authorities. See St. 1956, c. 465, § 2 (Massachusetts Port Authority); St. 1984, c. 372, § 3 (Massachusetts Water Resources Authority). We turn to the evidence in this case.

4. *The decision to remove.* The essence of the Governor's reasons for removing Levy and Mihos is that they forfeited approximately $30 million in new revenue, and that their alternative plan was not financially viable. When reviewing a decision to determine whether it is supported by substantial evidence, we must consider the entire record, taking into account whatever fairly detracts from the evidence on which the decision was based. See *Blue Cross & Blue Shield of Massachusetts, Inc.* v. *Commissioner of Ins.*, 420 Mass. 707, 710 (1995).

There was no evidence that the vote to "delay" the toll increases violated any covenant in the 1997 and 1999 trust agreements or their corresponding bond prospectuses. The evidence was to the contrary. The assumption in the bond prospectuses that tolls *might* be raised did not create an obligation to raise them. The consensus in 1996 between the former chairperson of the Authority, a former Governor, and legislative

leaders to raise tolls was not a binding agreement, and the underlying assumptions changed. The trust agreements and prospectuses do require the Authority to maintain a debt coverage ratio of 1.2:1 for each fiscal year, but the vote to defer toll increases to July 1, 2002, even without any alternative revenue plan, did not violate that requirement. The significance of this point was recognized by both Moody's and Fitch because they affirmed their ratings of the Authority's bonds after being informed only that on October 30, 2001, the members voted to "defer" the assumed toll increases to July 1, 2002. There is no evidence that Levy and Mihos failed to do anything legally required of them.

The Governor criticized the November 16 plan for its failure to generate significant "new revenue," and for relying to a large degree on deferred capital expenditures. There is no requirement to generate "new revenues." The debt coverage ratios the Authority was obligated to meet are not based on revenues alone, but on *net* revenues. Net revenues may be increased by cost savings. Additionally, the October 30 vote to defer toll increases, even without the November 16 plan, does not result in net revenues that fall below the 1.2:1 debt coverage ratio. The plan satisfies the Authority's existing obligations.

Evidence was presented that the rating agencies prefer the Authority to sustain a debt coverage ratio of 1.35:1. The alternative revenue plan adopted on November 16, 2001, meets even that mark for every fiscal year. An analysis of that plan was prepared by Authority staff under the supervision of Ladd on November 30, 2001, as Fitch had expressed a willingness to consider it when Levy and Mihos contacted Fitch analysts and reported that they had not received a complete picture of the Authority's actions. However, it was not forwarded in time to affect Fitch's report. Ladd's plan for the toll increase on January 1, 2002, which he urged the members to adopt on October 30, 2001 (and which the Governor favors), fails to meet the debt coverage ratio of 1.35:1 for the years 2004 through 2010. The finding that the November 16 plan was not viable is not supported by substantial evidence.

The November 16 plan had not been the result of "haphazard" planning, and it was not irrationally linked to the delay in

completion of the connection of the turnpike to Logan Airport. Levy and Mihos began developing alternatives by involving staff immediately after the August hearings. They sought the opinions from general counsel and bond counsel regarding bond requirements, and, as required by the Legislature, they considered input from the public. See G. L. c. 81A, § 4 (*i*). The issues raised by the public at the hearings, including linkage of the anticipated increases in tolls to access to Logan Airport through the Ted Williams Tunnel connection, were precisely the type of issues that the Legislature requires the members to consider. There was evidence that the anticipated completion of the Ted Williams Tunnel connection by the end of 2001 was linked to the anticipated toll increases. The two assumptions had been linked as early as 1996, and were incorporated in a traffic-revenue report prepared for the Authority in 1997. That report was attached to the 1997 and 1999 prospectuses. Had they not been linked, then there might have been good reason to seek a toll increase even earlier, a point not pressed here. Although the members were operating under a sense of urgency, that urgency was precipitated by external events that affected the assumptions behind the anticipated toll increases. There was nothing haphazard about their actions.

Contrary to the Governor's contention, there was no obliga-tion to vote on the proposed toll increases and the alternative revenue plan at the same time. There was no obligation to simultaneously replace the "lost" revenue from the deferral of the toll increases with alternative sources of new revenue. Ladd's efforts to ignore the revenue plan because it was not adopted on October 30 are not binding on Levy and Mihos. Moreover, although the October 30 vote and the November 16 plan were adopted at separate meetings, it is apparent from the evidence that they were proceeding on parallel tracks and were part and parcel of a single course of action. As noted above, Fitch had expressed an interest in seeing the analysis of the November 16 plan and would have considered it before releas-ing its November 30 report, but the analysis was not forwarded in time.

The Governor found that Levy and Mihos acted irresponsibly by potentially compromising the project. The Authority had met

all its obligations for the project imposed on it by the Legislature, and all obligations that the Authority otherwise assumed. This fact is referred to in the 1997 and 1999 bond prospectuses. The Authority had no outstanding financial obligations for the project as of October or November, 2001, and it is not a consideration in this appeal.

The criticism that Levy and Mihos interfered with the effective daily management of the Authority, and the related criticisms, are not supported by substantial evidence. They did nothing more than request information from senior staff that was reasonably necessary to carry out their duties in determining policy for the Authority. Levy and Mihos appropriately considered the contrary opinions of some staff. They are not required to follow the advice of staff. The members of the Authority, not staff, set the policy of the Authority in the circumstances here, subject to action by the Legislature.

This case boils down to a difference of opinion between the Governor and two members of the Authority over the policy of the Authority and the ability of the members to fix tolls. That difference of opinion does not constitute substantial evidence that Levy or Mihos acted in a manner that warrants removal by the Governor for cause.

Because we conclude that the decision to remove Levy and Mihos is not supported by substantial evidence, we need not address the claims that they were denied procedural due process at their hearing, or that the decision to remove Levy violated his First Amendment rights. The order for removal must be vacated.

*So ordered.*

CORDY, J. (dissenting, with whom Marshall, C.J., and Sosman, J., join). I concur with the court's conclusion that the Governor may not remove members of the Massachusetts Turnpike Authority (Authority) on the basis of differing opinions about policy; that would not constitute "cause" within the meaning of G. L. c. 30, § 9. I disagree, however, that the Governor has done so in this case. Rather, there is evidence here of financial irresponsibility and maladministration, which I would conclude

are adequate causes for the removal of a member of the Authority by the Governor. Because I believe the proper standard of judicial review of removal is whether the evidence on which the decision was based was sufficient to satisfy us that it was not arbitrary or capricious, and because in this case the evidence of financial irresponsibility and maladministration was adequate to satisfy both the arbitrary or capricious standard and the substantial evidence standard (applied by the court), I respectfully dissent.

The Authority was created by statute as "a body politic and corporate," placed within the Executive Office of Transportation and Construction, and made exempt from supervision and regulation by any executive branch, agency, department, or official except the Governor. *Levy* v. *Acting Governor*, 435 Mass. 697, 707 (2002). In addition, the Governor appoints the members of the Authority, and she alone has the power to remove them for cause under G. L. c. 30, § 9. In these limited but important respects, the Governor is accountable to the citizens of the Commonwealth for the performance of the Authority and the conduct of its members.

Beginning with the enactment of its new enabling statute in 1996 (G. L. c. 81A), the Authority has been significantly refashioned from the sleepy operator of a toll road and two tunnels to the manager of the largest construction project in the country, the future owner of its immensely sophisticated facilities, and the beneficiary of one billion dollars in taxpayer money to be paid to it over forty years for the purposes of maintaining and operating those facilities.

As of 1996, the vast majority of the cost of the Central Artery project (project) had been borne by the Federal government and the Commonwealth. Paying the balance of its projected cost (now estimated to be in excess of $14 billion) was then and continues to be a significant obligation of the Commonwealth. The enactment of G. L. c. 81A, the passage of subsequent related legislation, and the agreements entered into between the Commonwealth and the Authority pursuant thereto, all reflect a collective determination by the Governor, the Legislature, and the Authority that this obligation, while remaining the legal

obligation of the Commonwealth, is a shared responsibility between the Commonwealth and the Authority.[1]

The ability of the Authority and the Commonwealth to meet this shared responsibility in a fiscally prudent manner, and in the face of rising project costs, is largely premised on the ability to access the Authority's financial resources (tolls and real property), without jeopardizing existing bonds, bondholders, or covenants. To this end, the Governor, legislative leaders, and the Authority reached agreement in 1996 that certain future toll increases would be necessary on the Massachusetts Highway System (MHS). This agreement was incorporated into a plan of scheduled toll increases, which was announced and repeated by the Authority in its prospectuses and financial reports. The credibility of the Authority and the Commonwealth with the financial community and its bondholders was critically important to meeting their mutual financial objectives, and the commitment to toll increases (in the face of expected resistance) an important factor in establishing and maintaining that credibility. It is in this context that we must review the precipitous actions of Jordan Levy and Christy Peter Mihos two months before those toll increases were to go into effect, and of the Governor in removing them.

1. *Standard of Review.*

The removal of a public officer is quintessentially executive in nature. While "judicial review may be had of the propriety or good faith of a finding of cause by one intrusted with the power of removal . . . the general question of executive policy involved in a removal cannot be turned over to the courts." *Opinion of the Justices*, 300 Mass. 596, 599-600 (1938). Dating back more than one hundred years, this court has consistently held that judicial review of the discharge of a nontenured (i.e., noncivil service) public officer for "cause" is limited to whether the cause was adequate in law and the decision arbitrary. *Ayers*

---

[1]In furtherance of this shared responsibility, the Authority has raised and contributed in excess of $1.555 billion to the Central Artery project costs ($1.255 billion of this coming directly from the 1997 and 1999 Massachusetts Highway System [MHS] bond offerings), and has further committed $185 million from the sale of its "Allston Landing" real estate, $68 million in proceeds from the sale of additional parcels, and more generally, future revenue from the Authority's real estate assets as may be required to meet the rising costs of the project.

v. *Hatch,* 175 Mass. 489, 492 (1900) (holding, in context of mayor's removal of city assessor, "[i]f the cause assigned is a reasonable one, then, whether under the circumstances it is sufficient to justify a removal, is for the [executive] to decide and his decision is final"). See *Dunn* v. *Mayor of Taunton,* 200 Mass. 252, 258 (1908), citing *Gaw* v. *Ashley,* 195 Mass. 173 (1907) ("the official action of the mayor of a city under a power of removal 'for cause' can be revised by this court only when there has been an arbitrary exercise of power, and the cause alleged for the removal is unreasonable and in law insufficient"); *Gaw* v. *Ashley, supra* at 177 (it is only if "cause alleged is frivolous or unreasonable and in law insufficient, that we can revise" mayor's dismissal of board of health members for cause); *Hogan* v. *Collins,* 183 Mass. 43, 46 (1903) (holding in context of mayor's removal of election commissioner that "decision of the mayor upon the evidence . . . is not open to revision here, either to pass upon the weight of the evidence or to determine whether the evidence justified the finding").

This standard was most recently articulated and affirmed in *McSweeney* v. *Town Manager of Lexington,* 379 Mass. 794 (1980). There, the court reviewed a town manager's decision to remove the superintendent of public works and town engineer "for cause." The court reversed a Superior Court judge who had applied the "substantial evidence" test, relying on *Boston Edison Co.* v. *Boston Redevelopment Auth.,* 374 Mass. 37, 48-49 (1977), and *Bunte* v. *Mayor of Boston,* 361 Mass. 71, 74 (1972). The court concluded that, although the substantial evidence test was the appropriate standard of review in the *Boston Edison* case, the scope of review (under a writ of certiorari) is to be tailored to the substance of the complaint. *McSweeney* v. *Town Manager of Lexington, supra* at 799. Thus, the court stated that it would consider "the nature of the action sought to be reviewed" in determining the appropriate standard of review. *Id.* at 800. It went on to hold that in reviewing a decision to remove a public officer for cause, it would "uphold such decision so long as it is not arbitrary, capricious or an abuse of discretion." *Id.* "In other words, our review of the evidence presented at the removal hearing will not be to determine whether there was substantial evidence to support the findings,

but rather to determine whether there was sufficient evidence to satisfy the 'arbitrary and capricious' standard." *Id.* See *Saxon Coffee Shop, Inc.* v. *Boston Licensing Bd.*, 380 Mass. 919, 924 (1980), citing *McSweeney* v. *Town Manager of Lexington, supra* ("standard for termination of employment" is arbitrary, capricious, or abuse of discretion).

The court today holds that the substantial evidence standard should apply to the removal of a noncivil servant notwithstanding an unbroken line of cases culminating in the *McSweeney* case. It does so stating that the nature of the Governor's termination of a member of the Authority is different from the termination of a public officer over whom she might have broader oversight, responsibility, or control. It cites no authority for this new distinction. In my view, this is a distinction without a legal difference and will only confuse our jurisprudence and be difficult to apply in a principled manner to other terminations under G. L. c. 30, § 9, or comparable statutory provisions. A Governor appoints hundreds of individuals to serve on boards and commissions. Most are appointed for terms of years, many for terms longer than the four-year gubernatorial term.[2] These appointment statutes often make no provision for removal, thereby placing that responsibility on the Governor under G. L. c. 30, § 9. How do we determine the standard to apply? Do we look to the differing responsibilities of each board or commission and make individual assessments of the extent to which they are under the oversight or supervision of the Governor or independent therefrom in order to determine our standard of

---

[2]See, e.g., board of environmental management (seven-year term), G. L. c. 21, § 2; board of food and agriculture (seven-year term), G. L. c. 20, § 1; Savings Bank Life Insurance policyholders protective board (seven-year term), G. L. c. 178A, § 9; Massachusetts housing finance agency (seven-year term), St. 1966, c. 708, § 3, as amended; board of registration of architects (five-year term), G. L. c. 13, § 44A; board of trustees of the Massachusetts hospital school (five-year term), G. L. c. 111, § 3A; board of registration in podiatry (five-year term), G. L. c. 13, § 12A; board of registration in optometry (five-year term), G. L. c. 13, § 16; educational management audit council (five-year term), G. L. c. 15, § 55A; board of education (five-year term), G. L. c. 15, § 1E; board of registration in dentistry (five-year term), G. L. c. 13, § 19.

review?[3] The "nature" of the proceedings do not change depending on where the public officer being terminated is situated in the structure of government. All are in the nature of executive decisions to terminate employment and the standard of judicial review of a decision to remove remains the same: was the decision arbitrary or capricious. Of course, it remains the case that different levels of responsibility, discretion, or independence entrusted to a public officer, are factors that appropriately bear on what "cause" may be adequate in law, to support removal.

2. *Cause.*

There is no support in our law for limiting the "for cause" standard in the removal of public officers to misfeasance, malfeasance, or wilful neglect of duty. See A. Cella, Administrative Law and Practice § 1004 (1986). To the contrary, in *McSweeney* v. *Town Manager of Lexington, supra* at 798, we concluded that " '[c]ause' under the Town Manager Act includes any ground asserted in good faith which is not arbitrary, irrational, unreasonable, or irrelevant to the town manager's task of ensuring efficient management of the town." In reaching this conclusion, we specifically held that "[r]emoval 'for cause' does not require a showing of inefficiency, neglect, or misconduct, and hence the cause for removal need not amount to a· substantive dereliction of known duties or standards of performance." *Id.* at 797. Similarly, in *Dunn* v. *Mayor of Taunton,* 200 Mass. 252 (1908), we concluded that the mayor had sufficient grounds to remove town sewer commissioners under a statute which provided that they could be removed for "cause," based on actions that he found to be fiscally irresponsible, imprudent, and against the public interest. See *Ayers* v. *Hatch,* 175 Mass. 489, 492 (1900) (in mayor's removal of city assessor, "[c]ause implies . . . a reasonable ground of removal, and not a frivolous or wholly unsatisfactory or incompetent ground of removal"). See also *Gaw* v. *Ashley,* 195 Mass. 173, 177 (1907) (when cause alleged is frivolous or unreasonable and in

---

[3]Many other high ranking public employees whose actions the Governor supervises or oversees serve at her pleasure, and may be removed for no cause or any cause at all, e.g., Executive Secretaries, commissioners (and their senior staffs), and the staff in her own office.

law insufficient, we can revise mayor's dismissal of board of health members for cause); *Ham* v. *Board of Police of Boston*, 142 Mass. 90, 95 (1886) (court may review removal of police officer for "cause" to determine whether cause "unreasonable and in law insufficient; as, for example, refusing to contribute money for political purposes").

Although we have not previously had occasion to consider what causes for removal are sufficient in the context of the Governor's exercise of her power under G. L. c. 30, § 9,[4] I would interpret G. L. c. 30, § 9, consistent with our extended line of jurisprudence interpreting the standard of cause for the removal of public officers under similar statutes, and not limit it to grounds of misfeasance, malfeasance, or neglect of duty.

I agree that the duties and responsibilities entrusted to the members by the enabling act are intended to insulate them from the ever-changing political winds so that they may more independently act in the best interests of the Authority, its toll payers, and its bondholders. I also agree that it would be inconsistent with the Authority's statutory scheme to permit the Governor to remove its members on the basis of policy differences or disagreements and that such "cause" would be inadequate as a matter of law, and a removal decision based only on such evidence would be arbitrary or capricious. Removal for reasons of maladministration[5] or fiscal irresponsibility, however, are consistent with the purposes of ensuring responsible leadership over matters of important public and private trust, and protecting the responsibilities of the members to make independent judgments regarding the policy,

---

[4] In *Murphy* v. *Casey*, 300 Mass. 232 (1938), the Commissioner of Agriculture was removed by the Governor pursuant to G. L. c. 30, § 9, for the stated reasons of incompetence, lack of necessary qualifications and experience, and neglect of duty. The commissioner originally contended that these grounds were "insufficient in law for a removal for cause," but that claim was not pressed when the case was argued before the court, and therefore was not decided.

[5] Maladministration is one of the causes on which the impeachment of a public officer may be based under our Constitution. Part II, c. 1, § 2, art. 8, of the Constitution of the Commonwealth.

direction, and management of the Authority.

3. *Removal Decision.*

That conduct constituting financial irresponsibility and maladministration may not have exceeded the wide bounds of discretion vested in the members or may not have violated any legal duty, is not determinative of whether such cause exists. Conduct within those categories may well be fiscally irresponsible or constitute maladministration in the context of the events in which it occurs. In simplest terms, the Governor removed Levy and Mihos (at least in part) because they caused the Authority to renege on its commitment to raise tolls as scheduled, without adequate reason and without proper regard to the negative consequences of their actions to the financial strength and credit worthiness of the Authority,[6] and the impact on funding the project. This commitment was made by the Authority to the Governor and legislative leaders in 1996, repeated to the Federal Highway Administration, repeated to potential bond buyers in the prospectuses issued when it raised money to fund the project in 1997 and 1999, and repeated in

---

[6]Those negative consequences began to accrue shortly after the October 30 vote. In its revised outlook, Moody's Investors Services stated:

"Moody's believes that the six-month deferral of a previously scheduled toll rate increase will weaken cash flows for the MHS by approximately $30 million, reduce debt service coverage for the bonds, and deplete working capital reserves, and produce a deficit balance in the MHS General Fund. These reserves are important as a financial cushion for unforseen events, as a source of pay-go capital funding, and as a reserve for potential additional overruns and start up costs of the [Authority's] now $14.75 billion Central Artery/Tunnel project. In our April 2001 Global Credit Report on the [Authority] we noted that the . . . rating outlook was based on our expectation that management would make necessary adjustments to toll rates and expenditures . . . . *Given the reluctance of the [Authority] to increase tolls as scheduled, Moody's is concerned that future expected toll increases may be in jeopardy, and this would likely further erode credit quality*" (emphasis added).

The Fitch bond rating service followed Moody's and placed MHS bonds on a negative rating watch on November 30, 2001, citing concerns about the Authority's "ability to maintain financial discipline" and meet its financial commitments "at the margins of protection assumed by the current ratings."

the Authority's annual financial reports, the last of which was dated September 27, 2001.[7]

At the two-day hearing held in January, 2002, the Governor heard and considered the reasons articulated by Mihos and Levy to justify their actions. She found their explanations not credible, illogical, and irresponsible.[8] She also found the alterna-

---

[7]Both Mihos and Levy testified that the former chief financial officer of the Authority told them in February, 1999, that their vote to issue the 1999 MHS bonds did not make it mandatory that they raise tolls. The former chief financial officer did not testify. Whether or not their votes in 1999 made raising tolls "mandatory" is a different question from whether their vote to delay an announced toll increase two months before it was scheduled to go into effect was fiscally responsible in October, 2001. In this regard, the evidence included the Authority's most recent annual report to its bondholders and the investment community that was issued on September 27, 2001, and that *continued* to represent that the toll increase scheduled for January 1, 2002, would occur: "The [Authority] is expected to vote for toll increases in October 2001 for implementation in January 2002."

Mihos and Levy point out that the annual report qualified the statements it contained. That qualifying language, however, does not support their position that reliance should not have been placed on the Authority's increasing tolls in January, 2002. Specifically, the qualifying language in the annual report states:

> "The information contained in this document makes 'forward looking statements' by using forward-looking words such as 'may,' 'will,' 'should,' 'expects,' 'believes,' 'anticipates,' 'estimates,' or others. You are cautioned that forward-looking statements are subject to a variety of uncertainties that could cause actual results to differ from the projected results. Those risks and uncertainties include general economic and business conditions, receipt of funding grants, and various other factors which are *beyond our control*" (emphasis added).

The vote of the Authority just one month later to delay the toll increases was decidedly not an event beyond the Authority's control and was not a risk warned of either in the Authority's annual report or in the 1997 and 1999 prospectuses. To be adequate, cautionary language in a prospectus must be specific to the actual risks. See Hines *vs.* ESC Strategic Funds, Inc., U.S. Dist. Ct. No. 3:99-0530 (M.D. Tenn. Sept. 17, 1999) (prospectus that disclosed risks of fund's investments, but not risk that fund might decide to liquidate, was inadequate and misleading). See also *Weiner* v. *Quaker Oats Co.*, 129 F.3d 310 (3d Cir. 1997) (repeated representations in annual reports that issuer intended to maintain certain debt leverage guideline, a situation within its control, were material and should have been updated as soon as they became unreliable; cautionary language inadequate in such circumstances).

[8]Levy and Mihos point in part to the failure of two assumptions in the prospectuses to justify their delay in raising tolls, i.e., the failure to connect to the Ted Williams Tunnel in 2002, and the disruption to the economy caused

tive revenue plan which Levy and Mihos cobbled together after the vote of October 30, 2001 (to make up for $30 million in revenue lost by the vote to delay tolls), to be hastily prepared, imprudent, unrealistic, inadequate, and financially unviable.[9] While Levy and Mihos have labeled their dispute with the Governor a disagreement about toll policy, the evidence adduced before the Governor that Levy and Mihos caused the Authority to renege on an important, long-standing commitment to the executive and legislative branches of government as well as to the financial community, to the potential financial detriment of the Authority, the Commonwealth, and the project, was sufficient to establish adequate cause other than a mere policy disagreement, and therefore, satisfied the arbitrary and capricious standard.

---

by the events of September 11, 2001. The Governor concluded that this reasoning was illogical, and that the assumptions were in the prospectuses so that bond purchasers could judge the reliability of the Authority's financial projections — not as conditions precedent to its stated commitment to raise tolls on January 1, 2002. The failure of the assumptions created the need for more revenue, not less.

[9]The Authority's vote of October 30 delaying toll implementation called for the staff to study and report back to it in thirty days on a number of cost delaying and revenue enhancing ideas. On November 5, Levy and Mihos unexpectedly joined an Authority staff meeting and steered it to discussing possible measures that could make up for the $30 million loss in revenue resulting from the vote to delay in toll increases. Later that day, they announced an alternative revenue plan, which was amended in some respects on November 16 when they called a meeting and voted their plan (after the Governor had notified them of her action "suspending" them). The plan included deferring some capital maintenance expenditures on the Authority's roadways, raising tolls on commercial vehicles, putting two additional tolls on the MHS and studying further new tolls and the sale of additional Authority real estate (the proceeds of which appear to have already been separately committed to fund increased project costs).

Among other things, the Governor found the plan to be inconsistent with many of the purported reasons for not proceeding with the scheduled rate hike in the first place. For example, Mihos claimed that he voted to delay raising tolls because the people had not gotten the benefit of the connection between the Ted Williams tunnel and the Boston extension, because one should not raise "tolls" in a down economy, because former Governor Cellucci allegedly told him never to raise tolls, and because of opposition raised against the toll increases at public hearings held in the summer of 2001. However, the alternative plan included raising tolls on commercial vehicles and instituting new tolls on the MHS roadways, and would require a number of new public hearings at which heated opposition to new tolls could also be expected.

I would also conclude that the evidence received and considered by the Governor passes the substantial evidence test applied by the court. In order to meet that test, there must be more than just "some evidence" or "any evidence" that might rationally create an inference; rather, there must be "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Saxon Coffee Shop, Inc.* v. *Boston Licensing Bd.*, 380 Mass. 919, 930 (1980), quoting G. L. c. 30A, § 1 (6). In applying the test to the evidence, questions of credibility, or the resolution of " 'fairly conflicting views,' are for the [executive], and not for the court" to decide. *Id.* at 930, quoting *School Comm. of Wellesley* v. *Labor Relations Comm'n*, 376 Mass. 112, 120 (1978). In my view, there was ample evidence that Levy and Mihos acted in a financially irresponsible manner leading up to and following the October 30, 2001, vote on toll increases. While there certainly was evidence from which Levy and Mihos could argue their position, that is not the test; the mere existence of some evidence in their favor (as recited by the court today) does not mean that there was not substantial evidence to support the Governor's decision. The Governor was present during the hearings, was able to assess the credibility of witnesses, both in the context of conflicting testimony and more generally, and made credibility determinations that clearly and appropriately influenced her decision. She found the explanations of Levy and Mihos as to why they failed to follow the financial plan that had been in place for many years to be inconsistent and not credible in several regards. She also found the alternative revenue plan that they quickly developed after negative comment concerning their vote on October 30 to be unrealistic, financially irresponsible, inadequate, and not the product of the type of careful analysis and review necessary for such important financial decision-making. These conclusions are well grounded in the evidence, and even though contested by Levy and Mihos, fully meet the substantial evidence test and support the Governor's conclusion that adequate cause existed for their removal.

I would therefore affirm the Governor's termination of Levy and Mihos.