JORDAN LEVY & another[1] *vs.* THE ACTING GOVERNOR
& another.[2]

Suffolk. December 5, 2001. - January 25, 2002.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Governor. Massachusetts Turnpike Authority. Commonwealth,* Officers and
employees.

This court, upon consideration of questions reported to it by a single justice,
remanded the case to the county court for entry of a judgment declaring
that G. L. c. 30, § 9, conferred on the Governor the power to remove a
member of the Massachusetts Turnpike Authority in accordance with the
terms of that statute; further, the court declined, at this time, to consider
the issues in the remaining matters raised by the parties through the
reported questions. [700-707]

CIVIL ACTION commenced in the Supreme Judicial Court for
the county of Suffolk on November 19, 2001.

The case was reported by *Cordy, J.*

*Paul W. Johnson* for Jordan Levy.

*Richard J. Hayes* for Christy Peter Mihos.

*Thomas A. Barnico,* Assistant Attorney General (*Richard S.
Weitzel,* Assistant Attorney General, with him) for the Acting
Governor.

GREANEY, J. The plaintiffs, Jordan Levy and Christy Peter Mi-
hos, filed a verified complaint in the Supreme Judicial Court for
Suffolk County pursuant to G. L. c. 214, § 1, seeking declara-
tory and injunctive relief against the defendants, the Acting
Governor'(Governor) and the Secretary of the Commonwealth.
The plaintiffs challenge the Governor's efforts to remove them

[1]Christy Peter Mihos, as they are members of the Massachusetts Turnpike
Authority (Turnpike Authority).

[2]Secretary of the Commonwealth.

from their positions as members of the Massachusetts Turnpike Authority (Turnpike Authority).[3] The removal proceedings were begun by letters of the Governor dated November 16, 2001, informing each petitioner that, "I am removing you for cause from your position as member of the Massachusetts Turnpike Authority pursuant to M.G.L. c. 30, § 9."[4] The letters went on to state:

"You are being removed from your position because you have (1) violated your oath of office by failing to administer the duties of your office faithfully and impartially, (2) failed to provide constructive and effective leadership for the Authority, improperly interfering with management of the Authority and disrupting its operation, (3) acted in a fiscally irresponsible manner, engaging in actions and decisions that are contrary to the financial interests of the Authority and the Commonwealth and that violate the trust and undermine the confidence of the public finance market, the rating agencies, the Federal Highway Administration and the Department of Transportation Inspector General in the management of the Authority.

"If you would like to be heard with respect to your removal, I will be available to meet with you and you will have the opportunity to be heard regarding such cause for

---

[3]The Turnpike Authority is "a body politic and corporate" and "a public instrumentality" authorized "to own, construct, maintain, repair, reconstruct, improve, rehabilitate, finance, refinance, use, police, administer, control and operate" the Massachusetts "Turnpike" and a series of other roads known as the "[m]etropolitan highway system." G. L. c. 81A, §§ 1, 3. The Turnpike Authority consists of three members who are appointed by the Governor, and requires a quorum, consisting of two of its members, to perform its duties. *Id.* at § 2.

[4]General Laws c. 30, § 9, provides: "Unless some other mode of removal is provided by law, a public officer, if appointed by the governor, may at any time be removed by him for cause, and, if appointed by him with the advice and consent of the council, may be so removed with its advice and consent."

General Laws c. 30, § 9, took its essential form in 1902, long before the genesis of the public authority in Massachusetts. See R. L. c. 18, § 2 (1902). See also The Council of State Governments, Public Authorities in the States: A Report to the Governors' Conference (1953).

removal on Tuesday, November 20, 2001 at 2:45 p.m.[5] in my office at the State House. If you do not appear at such time, you will be deemed to have waived your opportunity to be heard.

"Pending such hearing, I hereby suspend you from your position as member of the Massachusetts Turnpike Authority, effective immediately."

In connection with the verified complaint, the parties presented a statement of agreed facts and exhibits to a single justice, who then reserved and reported the case to the full court stating "the following questions for determination:

"(1)(a) Whether the Court has jurisdiction over the claims set forth in the amended verified complaint under G. L. c. 214, § 1, or otherwise?

"(1)(b) Whether the Acting Governor of the Commonwealth is immune from the claims asserted against her in the amended verified complaint?

"(2) Does the Governor of the Commonwealth have the power to remove a Member of the Massachusetts Turnpike Authority?

"(3)(a) Assuming that the answer to Question Two is in the affirmative, is a Member of the Massachusetts Turnpike Authority entitled to a hearing before the Governor of the Commonwealth prior to removal?

"(3)(b) Assuming that the answer to Question Three (a) is in the affirmative, is the hearing before the Governor of the Commonwealth required to be a public hearing?

"(4) Assuming that the answers to Questions Two and Three (a) or Three (b) are in the affirmative, what procedural rights does a Member of the Massachusetts Turnpike Authority have in connection with his preparation for and the conduct of the hearing on his removal?

---

[5]The letter to Mihos provided for "the opportunity to be heard" on "Wednesday, November 21, 2001 at 10:00 a.m." In all other material respects, the letters were identical.

"(5) Assuming that the answer to Question Two is in the affirmative, what legal principles and standards apply to the decision of the Governor of the Commonwealth whether to remove a Member of the Massachusetts Turnpike Authority?"

On December 10, 2001, after hearing argument on the case, we entered the following order:

"With respect to the questions reported by the single justice in his Reservation and Report dated November 23, 2001, the court responds as follows:

"(A) General Laws c. 30, § 9, confers on the Acting Governor the power to remove a member of the Massachusetts Turnpike Authority in accordance with the terms of that statute (Question 2);

"(B) it is not appropriate at this time to consider the issues raised in the remaining questions (Questions 3 through 5)."

This opinion is in explanation of the order.

1. Reported question 1 (a) and (b) raise substantial issues as to jurisdiction and the immunity of the Governor. The parties argue that G. L. c. 214, § 1, concerning the jurisdiction of this court over "all cases and matters of equity cognizable under the general principles of equity jurisprudence," confers jurisdiction. They disagree, not as to the overarching issue raised by question 2, but as to whether the court should refrain from exercising its authority on the ground that the Governor is entitled to immunity from rulings on the reported questions. See *Milton* v. *Commonwealth*, 416 Mass. 471, 476 n.6 (1993).

The plaintiffs claim that the court should not grant the Governor immunity from any of their claims. The Attorney General does "not assert the immunity of the Governor" from a ruling on questions 2 and 5 because he asserts, relying on *Attorney Gen.* v. *Laffey*, 388 Mass. 743 (1983), that those questions "present the same question that could be the subject of an action in the nature of quo warranto under G. L. c. 249, § 9."[6] So, the Attorney General concludes, we should "deem the

---

[6]General Laws c. 249, § 9, provides: "The supreme judicial and superior courts shall have like jurisdiction of civil actions brought by the attorney

underlying nature of the controversy to be over the right of the [plaintiffs] to hold office and . . . not one that implicates the constitutional immunity of the Governor from suit."

In *Attorney Gen.* v. *Laffey, supra* at 745 & n.5, the court avoided the question whether the plaintiffs, who had been removed by the Governor from their offices as members of the Massachusetts Port Authority, could maintain actions under G. L. c. 214, § 1, seeking declaratory and injunctive relief against the Governor and the Secretary of the Commonwealth. We did so because the Attorney General had filed an independent action by a complaint in the nature of quo warranto under G. L. c. 249, § 9, seeking a declaration as to the plaintiffs' right to claim office as members of the Port Authority. *Id.* In this case the Attorney General has not filed an independent action seeking relief under G. L. c. 249, § 9 (perhaps because the plaintiffs have not yet been removed from their positions). However, because question 2 presents a matter of public interest that has been fully briefed, and as to which uncertainty and confusion exists, we shall express our opinion on that question.[7] See *Wellesley College* v. *Attorney Gen.*, 313 Mass. 722, 731 (1943). See also *O'Brien's Case*, 424 Mass. 16, 18 (1996); *Barry* v. *Commonwealth*, 390 Mass. 285, 288 n.4 (1983); *Trustees of the Smith Charities* v. *Northampton*, 10 Allen 498, 503 (1865).

As to the remaining questions, the Attorney General argues that the matters in questions 3 and 4, and the issues implicit therein, should not be resolved by us because any decision by this court might involve unwarranted judicial interference with the internal functioning of a separate branch of government, see *LIMITS* v. *President of the Senate*, 414 Mass. 31, 35 (1992); *Pineo* v. *Executive Council*, 412 Mass. 31, 36-37 (1992); and would violate the general rule of gubernatorial immunity stated in *Rice* v. *The Governor*, 207 Mass. 577, 579 (1911), namely that "[G]overnors of States are not amenable to the courts for their conduct in the performance of any part of their official

general against a person holding or claiming the right to hold an office or employment, the salary or compensation of which is payable by the commonwealth, a county, city or town."

[7] In doing so, we need not decide whether the case is properly before us under G. L. c. 214, § 1.

duties." We need not resolve questions 3 and 4, and the issues implicit therein, nor need we resolve question 5, because, "[i]n the expression of any opinion on [these issues] now, we cannot undertake definitively to adjudicate upon [them], so as to exclude [their possible] reconsideration hereafter." *Trustees of the Smith Charities* v. *Northampton, supra.* Put differently, the matters raised in these questions are premature for full court consideration.

2. The Turnpike Authority was established in 1952 by emergency legislation, St. 1952, c. 354 (enabling act).[8] The enabling act does not contain an express provision authorizing the removal of the Turnpike Authority's members. The plaintiffs argue that the absence of such a removal provision, viewed in conjunction with the enabling act's legislative history, demonstrates that "the Legislature explicitly considered the extent of the independence that it should confer [to the Turnpike Authority] and determined to preclude the Governor from removing [its] [m]embers." In support of this position, the plaintiffs point to the following facts:

> (1) although the enabling act was modeled after legislation creating the Mystic River Bridge Authority, which contained a removal provision, see St. 1946, c. 562, § 3 ("Each appointed member of the [Mystic River Bridge] authority may be removed by the governor, with the advice and consent of the council, for misfeasance, malfeasance or wilful neglect of duty, but only after reasonable notice and a public hearing, unless the same are in writing expressly waived"), the Legislature did not include a similar removal provision in the enabling act;

> (2) before enacting the enabling act, the Legislature considered other bills (each proposing to create a new entity to construct a major new highway), two of which

---

[8]The scope of the public works project authorized by St. 1952, c. 354 (enabling act), was originally limited to the construction of the "turnpike." St. 1952, c. 354, §§ 1, 4 (b). Over time, with the enactment of legislation, the Turnpike Authority assumed additional responsibilities over other public works projects. See St. 1958, c. 598, §§ 1, 2, 5 (Boston Harbor tunnel crossings); St. 1997, c. 3, §§ 6, 9, 10 ("metropolitan highway system," and repealing enabling act and St. 1958, c. 598).

contained express removal provisions. These other pieces of legislation were 1952 House Doc. No. 874 (proposing in § 1 to create the "Boston-Springfield Highway Authority who shall be appointed in the manner provided by [St. 1947, c. 544, § 2]," the Metropolitan Transit Authority's enabling act, which provided for five public trustees to be appointed by the Governor "with the advice and consent of the council," and who "may be removed for cause by the governor, with like advice and consent [of the council]"); 1952 House Doc. No. 613 (proposing in §§ 1 and 3 to create the "Massachusetts Toll Highway commission" whose appointed members "may be removed by the Governor, with the advice and consent of the council, for misfeasance, malfeasance or wilful neglect of duty, but only after reasonable notice and a public hearing, unless the same are in writing expressly waived"); and 1952 House Doc. No. 1404 (proposing in §§ 1 and 2 to create "the Massachusetts Public Service and Development Authority" and having no removal provision for its members);

(3) four years after the passage of the enabling act, the Legislature, in creating the Massachusetts Port Authority, included an express removal provision for the removal of the Port Authority's members, see St. 1956, c. 465, § 2 ("Each member of the Authority may be removed by the governor, with the advice and consent of the council, for misfeasance, malfeasance or willful neglect of duty but only after reasonable notice and a public hearing unless the same are in writing expressly waived");

(4) in 1966, the Legislature did not pass proposed amendments to the enabling act that included an express removal provision authorizing the Governor to remove both the chairman and other members of the Turnpike Authority,[9] see 1966 House Doc. No. 486 (proposing in § 2 to have a five-member board comprise the Turnpike Authority and providing that: "The chairman of the board shall be subject to removal at the will of the governor. The other members

---

[9]The proposed amendments were formulated in response to concerns of abuses of power within the Turnpike Authority. See 1965 Senate Doc. No. 1080, at 71.

of the board may be removed by the governor for misfeasance, malfeasance or willful neglect of duty but only after reasonable notice and a public hearing before the governor or his designated representative, unless notice and a public hearing are expressly waived in writing"); and

(5) in 1997 and 1998, although making significant amendments to the enabling act, the Legislature again did not provide a removal provision.

We are not persuaded that legislative history prior to 1997 determines the issues. The fact, relied heavily on by the plaintiffs, that, in 1996, the Legislature declined to amend the enabling act to insert removal provisions merely indicates that, at one point in time, the Legislature was urged to incorporate removal provisions which differed from the removal authority contained in G. L. c. 30, § 9. Similarly, omission from the enabling act over its history of a power of removal does not necessarily conclusively establish, as the Attorney General argues, that the Legislature relied on the presence of G. L. c. 30, § 9, to permit removal.

We conclude that the case turns not on the above referenced legislative history, but rather on amendments to the enabling act, which is now codified at G. L. c. 81A (and which, to date, insofar as this case is concerned, remains unchanged). We have already noted that over the passage of time, the scope of the Turnpike Authority's public works projects has expanded considerably. See note 8, *supra.* In 1997, in particular, the Turnpike Authority assumed management over the Central Artery project, by all concerns a vast undertaking. G. L. c. 81A, §§ 1, 3, 12. In connection with the transfer of supervision of this project to the Turnpike Authority from the highway department, the Legislature, in 1998, authorized the Commonwealth to provide the Turnpike Authority, through a contract between the Executive Office of Administration and Finance and the Turnpike Authority, with up to $25 million dollars in State funds each year for forty years after the transfer. See St. 1998, c. 235; G. L. c. 81A, §§ 3, 12 (*c*).

In addition, while the 1997 amendments state that the Turnpike Authority "shall not be subject to the supervision and

regulation of [the Executive Office of Transportation and Construction (where it was placed)] or any other department, commission, board, bureau or agency," see G. L. c. 81A, § 1, no such exemption is similarly provided concerning the Governor's authority. See *Lambert* v. *Executive Dir. of the Judicial Nominating Council*, 425 Mass. 406, 409 (1997) (stating that Governor is not "agency, executive office, department, board, commission, bureau, division or authority" subject to public records law). Significantly, the 1997 amendments codify important powers that the Governor possesses, and previously possessed, over the operation of the Turnpike Authority, including that (1) leases for "a period of forty years or more" of "air rights over land owned or held by [the Turnpike Authority]," or of certain leases of land, "shall be subject to the approval of the governor," G. L. c. 81A, §§ 15, 16; and (2) all leases granted by the Turnpike Authority under G. L. c. 81A, § 16, "shall be filed by the [Turnpike Authority] with the governor."

Other amendments by the Legislature go on to provide that the Turnpike Authority's contracts are subject to the public bidding laws governing construction contracts, including those imposed by G. L. c. 30. See G. L. c. 81A, § 4 (*r*); G. L. c. 149, §§ 26-29, §§ 44A-44J; G. L. c. 30, §§ 39F-39M. Cf. St. 1952, c. 354, § 5 (*m*), and that with respect to contracts concerning "emergency repairs," the Turnpike Authority may award such contracts, but only "with the approval of the secretary of the executive office of transportation and construction." G. L. c. 81A, § 4 (*r*).

The plaintiffs overlook the significance of these amendments, which posit long-term implications for both the Turnpike Authority and the public. These amendments and the 1997 restructuring show that, contrary to the plaintiffs' assertions, the Turnpike Authority "is fitted within the executive and administrative apparatus of the Commonwealth regulated under c. 30"; has limited independent existence; is not entirely self-financing; and is subject to certain supervision and control of executive branch officers, as well as the Governor. Compare *Opinion of the Justices*, 309 Mass. 571, 581-582 (1941) (expressing opinion that trustees of proposed State fund for worker's compensation were public officers subject to removal under G. L. c. 30, § 9; features of fund

disclosed that it was not a private corporation of any kind, but was an instrumentality of the Commonwealth), with *Opinion of the Justices*, 271 Mass. 582, 592-593 (1930) (expressing opinion that features of State motor vehicle insurance fund not instrumentality of government; "[p]erhaps in strictly legal aspects and functions [the fund] would stand on the footing of a private corporation"). These changes to the enabling act demonstrate, in our view, that, if the Legislature had desired to maintain the truly "independent" nature of the Turnpike Authority, free altogether from the Governor's influence, it would likely have done so in an express manner. The Legislature, however, chose not to do so. Thus, where no "mode of removal" is provided in G. L. c. 81A, the Governor is empowered under G. L. c. 30, § 9, to remove members of the Turnpike Authority, consistent with the established general rule that, in the absence of express legislation prohibiting removal, public officers are subject to the authority of the Governor under G. L. c. 30, § 9.[10] See A. Cella, Administrative Law and Practice § 1004 (1986). This interpretation, partly Euclidean and partly practical, avoids the anomalous result that, absent indictment and suspension under G. L. c. 30, § 59, or conviction and vacation under G. L. c. 279, § 30, the members of the Turnpike Authority, while performing an "essential government function," see G. L. c. 81A, § 1, would otherwise be essentially unaccountable for their actions, except, perhaps, for direct legislative intervention.

We now deal with residual issues. We reject the plaintiffs' contention that *Opinion of the Justices*, 216 Mass. 605 (1914), requires a different result. That case predates the use of public authorities in Massachusetts, and the statement made therein that R. L. c. 18, § 2 (1902), "applies only to those in the civil service," when viewed in context, refers to non-military personnel and nonconstitutional officers. See *Opinion of the Justices, supra* at 607; *Murphy* v. *Casey*, 300 Mass. 232, 234 (1938) (Commissioner of Agriculture subject to removal under G. L. c. 30, § 9). See also note 4, *supra.* In addition, *Commonwealth*

---

[10]The plaintiffs do not dispute, in the event that G. L. c. 30, § 9, applies, that the members of the Turnpike Authority each would constitute a "public officer" thereunder.

v. *Toomey*, 350 Mass. 345 (1966), offers no guidance. That case examined provisions of the enabling act, and not any of the amendments relevant here. Finally, we conclude that the express reference to an "authority" in G. L. c. 30, § 59 (authorizing Governor to suspend indicted "officer or employee of the commonwealth, or of any department, board, commission or agency thereof, or of any authority created by the general court" if the Governor appointed such officer or employee), does not show a legislative intent to exclude the members of the Turnpike Authority from removal under G. L. c. 30, § 9. See *Bessette* v. *Commissioner of Pub. Works*, 348 Mass. 605, 608 (1965).

3. The case is remanded to the county court for entry of a judgment declaring that G. L. c. 30, § 9, confers on the Governor the power to remove a member of the Turnpike Authority in accordance with the terms of that statute and declining, at this time, to consider the issues in the remaining matters raised by the parties through the reported questions.