**Christy Peter MIHOS, Plaintiff**

v.

**Jane M. SWIFT, individually and in her official capacity as the Acting Governor of the Commonwealth of Massachusetts, and William F. Galvin, in his official capacity as the Secretary of the Commonwealth of Massachusetts, Defendants**

No. CIV.A. 02–10306–REK.

United States District Court,
D. Massachusetts.

Dec. 17, 2002.

Richard J. Hayes, Boston, MA, Harvey A. Schwartz, Rodgers, Powers & Schwartz LLP, Boston, MA, for Christy Peter Mihos, Plaintiff.

David R. Kerrigan, Attorney General, Boston, MA, Wayne F. Dennison, Brown Rudnick Berlack Israels LLP, Boston, MA, for Jane Swift, individually and in her official capacity as the Acting Governor of the Commonwealth of Massachusetts, Defendant.

## Opinion

KEETON, District Judge.

### I. Summary of Rulings

At the Case Management Conference (CMC) of November 26, 2002, I presented to counsel related sources of constitutional, statutory, and precedential guidance that are, in my view, central to deciding the final outcome of this case. As that conference proceeded, the attorneys joined in a request for time to file memoranda of authorities on these matters. I allowed that request and have now had the benefit of their thoughtful and very helpful submissions, and the benefit of oral arguments at the Case Management Conference of December 10, 2002.

This opinion explains rulings of the court concerning fundamental rights of the plaintiff and defendant that are protected by the First Amendment to the Constitution of the United States. First Amendment rights are invoked in four distinct contexts: (1) the claims of the plaintiff, (2) the defenses against those claims, (3) the counterclaims of the defendant Swift, and (4) the defenses against those counterclaims.

In the American legal system, other constitutional provisions (federal and state), statutes (federal and state), and precedents (federal and state) guarantee protection for freedom of action and expression, beyond that afforded by the federal First Amendment.

Applying these constitutional, statutory, and precedential sources of guidance, I decide in this case, as matters of law are decided, nine propositions. The first three are stated immediately below.

■ *Proposition One.* As previously held in this case, plaintiff, Mihos, as a matter of law, is entitled to some form or forms of relief, equitable in nature, because of Acting Governor Swift's retaliation against him for his voting, in his capacity as Massachusetts Turnpike Commissioner, contrary to her communicated wishes. *See Mihos v. Swift,* —— F.Supp.2d —— (D.Mass.2002) (slip op. at 6–8).

*Proposition Two.* At a minimum, Mihos is entitled to declaratory relief; he is entitled to a declaration that his right to vote the way he considered appropriate is a right protected by the First Amendment to the Constitution of the United States of America. *Id.,* slip op. at 6–7.

■ *Proposition Three.* Acting Governor Swift, at a minimum, has defenses, grounded in the First Amendment, to the scope of relief that a court may grant on the claims by Mihos.

The reasoning on which Proposition Three is founded is explained in Parts II–IV, VI, and VIII of this opinion.

For the reasons explained in Parts IV–VII of this opinion, the rights identified in these three propositions are protected also on numerous additional grounds.

On the basis of the stated propositions and additional considerations bearing on costs and attorneys' fees, I have determined, as matters of law are decided, that Acting Governor Swift has First Amendment and other protections against liability under the claims by Mihos for punitive damages, for defamation, and for costs and attorneys' fees incurred by Mihos.

Also, I decide, as matters of law are decided, that Mihos is not entitled to an award of damages by this court under 42 U.S.C. § 1983 for costs and attorneys' fees.

## II. The First Amendment Applies to Claims by Mihos

Even though, as is explained in Part III below, the First Amendment protections for expression are usually invoked defensively, occasionally the First Amendment can appropriately be invoked to support a claim.

By the time the present case came before me, moreover, it had become clear, as I interpret the precedents, that Supreme Court decisions and decisions of the Courts of Appeals for several Circuits, including the First, support extension of First Amendment protection to rights of plaintiffs like those asserted by Mihos in this case. *See Mihos v. Swift, supra,* 2 slip op. at 6

## III. The First Amendment Applies to Defenses of Swift

### A. Introduction

This case arises out of the efforts of Acting Governor Jane M. Swift to ensure the effective management of one of the largest public works projects in history. Plaintiff is a member of the Massachusetts Turnpike Authority (the "Authority"), which owns and operates the Massachusetts Turnpike, the Boston Harbor Tunnel Crossing, and certain facilities at the Metropolitan Highway System. The Authority also acts on behalf of the Massachusetts Highway Department with regard to the design and construction of the Central Artery Project. Plaintiff here alleges that Swift interfered with his federally protected civil rights by exercising her discretion to remove him as a member of the Authority. She caused a letter to be delivered to Mihos informing him that she was removing him "for cause" from his "position as a member of the Massachusetts Turnpike Authority pursuant to M.G.L. c. 30, § 9." *Levy v. Acting Governor ("Levy I"),* 435 Mass. 697, 698, 761 N.E.2d 494 (2002). The letter stated in part as follows:

You are being removed from your position because you have (1) violated your oath of office by failing to administer the duties of your office faithfully and impartially, (2) failed to provide constructive and effective leadership for the Authority, improperly interfering with management of the Authority and disrupting its operation, (3) acted in a fiscally irresponsible manner, engaging in actions and decisions that are contrary

to the financial interest of the Authority and the Commonwealth and that violate the trust and undermine the confidence of the public finance market, the rating agencies, the Federal Highway Administration and the Department of Transportation Inspector General in the management of the Authority.

*Levy I* at 698–99, 761 N.E.2d 494.

Following proceedings initiated by Mihos and Levy, another Authority member, in the Supreme Judicial Court, Swift conducted hearings concerning the removal of Mihos and Levy. *Id.* Those hearings were conducted over the course of two days. *Levy v. Acting Governor ("Levy II")*, 436 Mass. 736, 744, 767 N.E.2d 66 (2002). Evidence was presented on the revenue needs for the Massachusetts Turnpike Authority, whether the revenue plans prepared by the various parties met debt coverage ratios preferred by bond rating agencies, and whether a revenue plan prepared and submitted by Mihos was sufficient to meet Authority obligations. *Levy II* at 749–51, 767 N.E.2d 66. "Ms. Swift was present during the hearings and assessed the credibility of the witnesses, both in the context of conflicting testimony and more generally...." *Levy II* at 762, 767 N.E.2d 66 (quoting Cordy, J., dissenting).

The letter in which Swift notified Mihos that she was removing him from office was dated February 6, 2002. In the exercise of her discretion, Swift had concluded that Mihos' "acts and omissions concerning the Authority's finances, particularly during the time period culminating with the Authority's October 30, 2001[,][b]oard meeting and immediately thereafter, were fiscally irresponsible, resulting in adverse consequences of substantially decreasing projected revenues of the Authority, damaging the Authority's credit outlook, and creating financial instability." *Levy II* at 744, 767 N.E.2d 66. Swift further found

that the alternative revenue plan prepared by Mihos was created "hurriedly" and in a "haphazard" manner, and that it did not "adequately compensate for the revenues that had been lost as a result of [Mihos' and Levy's] actions." *Levy II* at 745, 767 N.E.2d 66. Swift also identified several other reasons for Mihos' removal, including his interference with the lines of authority, divisiveness with respect to the Authority's staff, micro-management of matters, and the fact that he had jeopardized the Authority's standing with bond rating agencies. *Levy II* at 745, 767 N.E.2d 66.

Plaintiff here seeks monetary damages of three types based on Swift's decision to terminate him for, *inter alia*, fiscal irresponsibility. First, Mihos says that he is entitled to recovery of the "large amounts in legal fees" incurred in "defending himself against the acting governor's conduct in removing him from the Massachusetts Turnpike Authority." Plaintiff's Submission Concerning Damages, dated November 21, 2002, p. 2. Second, blaming Swift for the adverse publicity that he perceives himself to have received, Mihos seeks compensation for "the damage that was done to his ... name and reputation, and the emotional travail he underwent...." *Id.* Finally, "Mihos seeks an award of punitive damages against the acting governor." *Id.* at 3.

## B. Common First Amendment Application to Defenses

The most commonly expected and accepted application of the First Amendment is defensive. This was the kind of application that occurred in the first recognition by the Supreme Court of the United States of a constitutional foundation for privilege in defamation cases. The case was *New York Times Co. v. Sullivan*, 376

U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

The federal First Amendment protects the right of a citizen of the United States of America to comment on public affairs and the performance of public officials. *Hustler Magazine v. Falwell*, 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988). A passage in Chief Justice Rehnquist's opinion in *Hustler* cites with approval a 1944 opinion of Justice Frankfurter, among other precedents supporting a citizen's right to criticize public officials and their performance in office.

This case presents us with a novel question involving First Amendment limitations upon a State's authority to protect its citizens from the intentional infliction of emotional distress. We must decide whether a public figure may recover damages for emotional harm caused by the publication of an ad parody offensive to him, and doubtless gross and repugnant in the eyes of most. Respondent would have us find that a State's interest in protecting public figures from emotional distress is sufficient to deny First Amendment protection to speech that is patently offensive and is intended to inflict emotional injury, even when that speech could not reasonably have been interpreted as stating actual facts about the public figure involved. This we decline to do.

At the heart of the First Amendment is the recognition of the fundamental importance of the free flow of ideas and opinions on matters of public interest and concern. "[T]he freedom to speak one's mind is not only an aspect of individual liberty—and thus a good unto itself—but also is essential to the common quest for truth and the vitality of society as a whole." *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 503–04, 104 S.Ct. 1949, 1961, 80 L.Ed.2d 502 (1984). We have therefore been particularly vigilant to ensure that individual expressions of ideas remain free from governmentally imposed sanctions. The First Amendment recognizes no such thing as a "false" idea. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789 (1974). As Justice Holmes wrote, "[W]hen men have realized that time has upset many fighting faiths, they may come to believe even more than they believe the very foundations of their own conduct that the ultimate good desired is better reached by free trade in ideas—that the best test of truth is the power of the thought to get itself accepted in the competition of the market. . . ." *Abrams v. United States*, 250 U.S. 616, 630, 40 S.Ct. 17, 22, 63 L.Ed. 1173 (1919) (dissenting opinion).

The sort of robust political debate encouraged by the First Amendment is bound to produce speech that is critical of those who hold public office or those public figures who are "intimately involved in the resolution of important public questions or, by reason of their fame, shape events in areas of concern to society at large." *Associated Press v. Walker*, decided with *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 164, 87 S.Ct. 1975, 1996, 18 L.Ed.2d 1094 (1967) (Warren, C.J., concurring in result). Justice Frankfurter put it succinctly in *Baumgartner v. United States*, 322 U.S. 665, 673–74, 64 S.Ct. 1240, 1245, 88 L.Ed. 1525 (1944), when he said that "[o]ne of the prerogatives of American citizenship is the right to criticize public men and measures." Such criticism, inevitably, will not always be reasoned or moderate; public figures as well as public officials will be subject to "vehement, caustic, and sometimes unpleasantly sharp attacks", *New York Times, supra*, 376 U.S. 254, 270, 84 S.Ct. at 721. "[T]he

candidate who vaunts his spotless record and sterling integrity cannot convincingly cry 'Foul!' when an opponent or an industrious reporter attempts to demonstrate the contrary." *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 274, 91 S.Ct. 621, 626, 28 L.Ed.2d 35 (1971).

The reasoning in these precedents makes clear that the citizen interest in freedom of expression is not lost to a' citizen simply because she or he becomes a public official. The public interest is served by granting freedom of comment to citizens who hold public office as well as to those who do not.

The First Amendment declares only the minimum of constitutional protection. It does not say, "no more protection than this is available." And, indeed, more protection for freedom of expression is available in the American legal system.

Not only American citizens have the right to criticize public men and women. Government officials also have that right. They, too, are citizens. They do not give up the right to criticize other public officials just by taking public office. This proposition is firmly embedded in the American legal system as a constitutional principle. Indeed, it may even be constitutional in a deeper sense than just in the sense that it is expressed in the text of the First Amendment. It is also constitutional in what is often called the "British" sense. It is a part of our legal culture and a part of our governmental system without need for being expressed in the text of an amendment to our American Constitution. Nevertheless, it has in fact been declared in the text of the First Amendment.

For all these reasons, a governor has a right to criticize other public officials. It may be that, because of the plaintiff's right to vote as he sees fit, he is protected against some of the consequences that might otherwise flow from the decision that Acting Governor Swift is protected by the First Amendment. For example, she cannot dismiss him from office simply because she does not like his vote as a member of the Turnpike Board. But she still has the right to criticize him. Indeed, one might properly say that hers is not just an equal right. Instead, because she is the chief executive of the state, it is even more important that the law protect her right to criticize other public officials when they do not behave the way she believes they should behave.

Even if she is wrong, she has the right to express her view.

You do not understand, or are not committed to the First Amendment, until you are committed to the proposition that it protects the speech you hate, the speech with which you disagree most ardently. Only if you have come to that perception are you committed to the First Amendment.

A judge is obligated to commitment to the First Amendment in making judicial decisions. Acting as a judge, I am entirely comfortable being committed to the proposition that people have the right to speak the very messages and content that are most contrary to my views about protections for freedom in the American legal system.

The public interest in protecting freedom of comment increases with the governmental authority of the official and is at its zenith in the chief executive of a state government. Thus, it is especially in the public interest that the governor of a state have maximum protection for freedom to criticize the performance of other officials holding positions in the state government or state agencies, including an agency such as the Turnpike Authority.

It is in the public interest that both the state itself and the chief executive of the

state be protected against claims for damages based on the chief executive's criticism of the performance of other public officials. The people of a state are best served by a governor who is energetic, strong, and committed. It is incompatible with First Amendment and other protective foundations of good government in the American legal system that a governor should leave office burdened by threats of claims of punitive damages and claims for damages to reputation.

## IV. Four Propositions Supported by the First Amendment and Precedents Identified Thus Far

Stated here are four propositions that are supported by the precedents cited in Parts II and III. The first three of these propositions were stated in Part I and the fourth is stated here for the first time.

*Proposition One.* As previously held in this case, plaintiff, Mihos, as a matter of law, is entitled to some form or forms of relief, equitable in nature, because of Acting Governor Swift's retaliation against him for his voting, in his capacity as Massachusetts Turnpike Commissioner, contrary to her communicated wishes. *See Mihos v. Swift,* —— F.Supp.2d —— (D.Mass.2002) (slip op. at 6–8).

*Proposition Two.* At a minimum, Mihos is entitled to declaratory relief; he is entitled to a declaration that his right to vote the way he considered appropriate is a right protected by the First Amendment to the Constitution of the United States of America. *Id.,* slip op. at 6–7

*Proposition Three.* Acting Governor Swift, at a minimum, has defenses, grounded in the First Amendment, to the scope of relief that a court may grant on the claims by Mihos.

■ *Proposition Four.* First Amendment protection for rights of freedom of expression extend, in appropriate cases

that include the present case, both to a plaintiff's claims and to defenses against them.

## V. The First Amendment Applies to Counterclaims and Defenses Against Them

When it is appropriate under procedural rules of a state or federal court that a counterclaim be asserted in a case rather than requiring the defendant to file a separate civil action in the same or a different state or federal court, ordinarily if not universally it is appropriate for the court in which the original civil action is pending to allow the defendant to file a timely tendered pleading asserting the counterclaim. These procedural rights, along with Propositions One, Two, Three, and Four, support recognition of another proposition of substantive law that is stated here as Proposition Five.

*Proposition Five.* The First Amendment supports application, in state and federal courts, of First Amendment protections in deciding the merits of procedurally appropriate counterclaims and defenses to them.

Support for this proposition had emerged well before the time my co-editors and I were preparing the manuscript we submitted to the publisher of Keeton, Sargentich & Keating, *Cases and Materials on Tort and Accident Law* (3rd ed. 1998) (West). Chapter 22 is entitled, "First Amendment and Related Protections Against Liability for Damages."

In the introduction to Chapter 22 we explained first our pedagogical reasons for bringing together at this point the materials included in Chapter 22. We turned to commenting on substantive law relationships among all the materials brought together in Chapter 22. From those comments, I extract here the first of the comments about substantive law

relationships that influences my decision to declare, at this time in this case, my decision rejecting the claims of Mihos against Acting Governor Swift for punitive damages and damages for alleged defamation.

> ... If First Amendment protection is available, it is decisive *against all claims* [for damages], whatever their nature. Thus, in practice, it often happens that cases are decided for a defendant on First Amendment grounds—*sometimes even on summary judgment*—without the court's ever determining potentially disputable issues of fact and law related to definition of a prima facie case for the plaintiff. . . .

*Id.* at 1058 (emphasis added). This protection against *"all claims"* for damages extends, of course, to counterclaims for damages.

## VI. Other Constitutional, Statutory, and Precedential Provisions Support Prohibitions Against Claims for Punitive Damages and for Damages for Defamation

The introduction to Chapter 22 of our 1998 coursebook proceeds, after referring to First Amendment protections, to identify and comment, in a brief and introductory way, on protections for freedom of expression appearing in other state and federal constitutional, statutory, and precedential sources.

> The law's protection for communications may extend beyond the scope of the First Amendment. One reason this is so is that the First Amendment bears primarily, if not exclusively, upon *"government"* or *"state"* action. Another reason is that the *high value our legal system places upon freedom of communication sometimes influences legislation and precedent in ways beyond the impact of the First Amendment.*

Keeton, Sargentich & Keating, *supra,* at 1058 (emphasis added).

These additional reasons for protecting communication, taken along with Propositions One through Five, lead to the statement of a sixth proposition.

*Proposition Six.* Both awards of punitive damages and awards of damages for claimed defamation are, in all but the most exceptional circumstances, incompatible with First Amendment and other protections of law for freedom of expression.

The existence of support from sources beyond the federal First Amendment for freedom of expression is especially important in the present case. The law's protection of communications by the defendant, the Acting Governor, does extend beyond the First Amendment to the Constitution of the United States. It extends, in the first place, to the constitutional provisions in Massachusetts and precedents in Massachusetts.

The text of a Massachusetts constitutional provision that is analogous to the federal First Amendment states a potentially broader protection than that of the federal First Amendment. That provision of the Massachusetts Declaration of Rights declares that the "right of free speech shall not be abridged." M.G.L.A. Const. Pt. 1, Art. 16. In contrast with the federal First Amendment's focus on prohibiting governmental interference with freedom of expression, this Massachusetts provision makes no explicit reference to governmental acts. If it does not explicitly prohibit influential individuals and private entities of the community from abridging free speech, at the least it is open to interpretation as barring abridgement of free speech by influential persons and entities.

The Supreme Judicial Court of Massachusetts has long made it clear that it interprets the Massachusetts analogue to

the federal First Amendment as providing broader protection for freedom of expression than the federal First Amendment provides. *See Batchelder v. Allied Stores International, Inc.,* 388 Mass. 83, 89, 445 N.E.2d 590, 593 (1983) ("We also think that the distinction [between (1) the text of the federal constitutional provisions in the federal First Amendment and Fourteenth Amendment regarding 'state' action and (2) state constitutional provisions not containing 'state' action language] is significant and reject any suggestion that the Declaration of Rights should be read as directed exclusively toward restraining government action.")

## VII. Courts Have a Distinctive Role in Weighing Competing Claims of Right

### A. Substantive Law Issues

In most of the precedents cited in Parts II–VI above, substantive law issues were the primary focus of the decisions. The authority of the courts to consider these issues when weighing competing claims of right are so clear that no need existed to explain that authority.

### B. Qualified Immunity as Protection Against Burdens Incident to Being Sued

As the United States Supreme Court recognized in *Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), "the 'consequences' [of not providing qualified immunity] are not limited to liability for money damages; they also include 'the general costs of subjecting officials to the risks of trial—distraction of officials from their governmental duties, *inhibition of discretionary action,* and deterrence of able people from public service.'" *Id.* at 526, 105 S.Ct. 2806 (emphasis added). Thus, the Court held that qualified immunity is

entitlement not to stand trial or face the other burdens of litigation, conditioned on the resolution of the essentially legal question whether the conduct of which the plaintiff complains violated clearly established law. The entitlement is an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial

*Id.* (emphasis in original).

### C. Finding Facts Courts Are Best Positioned to Decide

*New York Times v. Sullivan, supra,* introduced not only a First Amendment privilege against being held liable for defamation of a public figure or a public official but also a principled practice by the Supreme Court of the United States of making decisions of fact on the basis of which that constitutional privilege is applied in a particular case. And, of course, if the Supreme Court declares that it sometimes has the obligation of making fact decisions, so must the Courts of Appeals, and so must the trial courts.

Law sometimes assigns to a finder of facts (jury or judge in a non-jury trial) and at other times assigns to courts (to be decided as matters of law are decided) the function of drawing from historical facts (either historical facts that are undisputed or historical facts as found by a finder of facts on disputed evidence) an evaluative inference that what happened satisfied a legal test upon which the outcome depends. This function is assigned to a court, not to a jury (or a trial judge as finder of fact), when the court determines that (1) the court is significantly better positioned than a finder of fact to decide the combined legal-factual issue, (2) risks of misapplication of the controlling law by a finder of fact are substantial, and (3) the legal

protection for the interest at risk is constitutional.

Keeton, Sargentich & Keating, *supra*, at 1143.

We were stating those points for the purpose of teaching students tort law, modern tort law, up-to-date tort law. Our purpose was to teach them how to think about the tort law that they would be practicing years into the future—for example, in 2003 or 2004 when they might be engaged in a professional performance as judge, or as lawyer trying to influence the decision of a trial judge or appellate judges.

A significant difference exists between (1) the Court's holding that the Court itself (and, of course, lower courts as well) must exercise independent judgment over an issue rather than reviewing deferentially a purported factual finding by a jury because the factual issue is too tightly interwoven with a legal issue material to a constitutional challenge to be left to a jury, and (2) the Court's exercising independent review only to ensure that juries (and trial judges as finders of fact) have not erred in applying the law.

The Supreme Court of the United States in *Sullivan* did the first of these, not the second. And the sequels, including *Hustler*, have carried that theme forward.

The present case presents not only issues that are constitutional in the substantive-law sense but also some issues involving questions of fact that must be decided by courts as matters of law are decided. When issues involving questions of fact of this kind are before a court, it is the court's peculiar duty to decide those questions of fact.

The role of courts in this respect is founded in constitutional principles that were developed and debated publicly in the period immediately before and after the American Revolution. *See, e.g., Change the Climate, Inc. v. Massachusetts Bay Transportation Authority*, 214 F.Supp.2d 125, 158 (D.Mass.2002). Historical support for this proposition leads to a point that is stated here as Proposition Seven.

*Proposition Seven.* The distinctive role of a court in deciding which among clashing claims of constitutional protection for freedom of expression will prevail in a case before the court is founded in public interest and supported by fundamental principles of good government that were publicly debated and were part of the impetus for the American Revolution.

This proposition is reinforced by the history of development of our federal Constitution and early state constitutions, including that of the Commonwealth of Massachusetts.

The United States of America, as well as the Commonwealth of Massachusetts, are republics in which the people, through their representatives and magistrates, engage in self-government. As stated by James Madison in the Federalist Papers:

The first question that offers itself is, whether the general form and aspect of the government be strictly republican. It is evident that no other form would be reconcilable with the genius of the people of America; with the fundamental principles of the Revolution; or with that honorable determination which animates every votary of freedom, to rest all our political experiments on the capacity of mankind for self-government. If the plan of the convention, therefore, be found to depart from the republican character, its advocates must abandon it as no longer defensible.

If we resort for a criterion to the different principles on which different forms of government are established, we may define a republic to be, or at least may bestow that name on, a government which derives all its powers directly or indirectly from the great body of the people, and is administered by persons holding their offices during pleasure, for a limited period, or during good behavior. It is ESSENTIAL to such a government that it be derived from the great body of the society.

James Madison, Federalist Papers, No. 39.

Indeed, the legitimacy of the laws of the United States emanates from the republican character of their adoption as well as the representative nature of our government. As Madison further states, "attempts to enforce by legal sanctions, acts obnoxious to so great a proportion of Citizens, tend to enervate the laws in general, and to slacken the bands of Society." *See* James Madison, Memorial and Remonstrance (1785).

*Change the Climate, supra,* 214 F.Supp.2d at 159.

This distinctive role of a court is one that a court must exercise when deciding among clashing claims for constitutional protection for freedom of expression.

The court is obligated to and will decide this case by considering and weighing the rights and interests of all parties affected by the judgment that resolves this controversy. This role is proper for a court, which sits as an impartial adjudicator. This role of courts is a fundamental characteristic of the American legal system.

The roles of twenty-first century legal professionals in the Bar, Bench, and Academies in the United States owe much to James Madison's seminal thinking expressed publicly and privately during debates over the structure of the new form of related state and national governments to be established under a constitution drafted in May 1787 to cure deficiencies in the Articles of Confederation (1777). *See generally* John P. Kaminski, Ph.D, Director, and Richard Leffler, Ph.D., Co–Director, The Center for the Study of the American Constitution, The University of Wisconsin–Madison, *The Origins of the Three Branches of Government,* Federal Judicial Center Traveling Seminar 3–9 (2001) (Wisconsin Study). As a reminder of timing of important events, I reproduce here excerpts from the Wisconsin Study's "Chronology of the American Revolutionary Era":

| | |
|---|---|
| 1774 September 5 | First Continental Congress |
| 1775 April 19 | Battles of Lexington and Concord |
| 1775 May 10 | Second Continental Congress |
| 1775 June 17 | Battle of Bunker Hill |
| 1776 July 4 | Declaration of Independence |
| 1777 November 15 | Congress Agrees to Articles of Confederation |
| 1781 March 1 | States Adopt Articles of Confederation |
| 1781 October 19 | British Surrender at Yorktown |
| . . . . | |
| 1786 Sept. 11–14 | Annapolis Convention (Proposes Constitutional Conv.) |
| 1787 February 21 | Congress Calls Constitutional Convention |
| 1787 May 25 | Constitutional Convention Meets |
| . . . . | |

*Id.,* 214 F.Supp.2d at 160.

The distinctive role of courts is supported by fundamental conceptions of professionalism of the Bar as well as the Bench.

Professionalism of persons educated in law, as it came to be recognized in the United States in the late nineteenth century and the early decades of the twentieth century, did not exist in the time of the Founders.

Its development owed much to the Founders' ideas about the roles of impartial judges, and advocates who would appear before them. The earliest readily accessible record of public discussion of ideas about developing a corps of impartial judges and advocates is the record of communications occurring, publicly and privately, as the Founders proceeded with their drafting of a proposed constitution. We now have an increased treasure trove of records of these spirited debates that includes materials gathered, pruned, edited, and published, along with incisive commentary, by the Directors of the Wisconsin Study. *See, e.g., The Origins of the Three Branches of Government, supra.* Strangely, at least from the perspective of twenty-first century mores of communication, a large part of the essence of those debates was exposed contemporaneously in publications more like twentieth and early twenty-first century newspapers than books, or magazines, or professional journals. That large body of expressions is available to interested twenty-first century readers in collections commonly referred to as "federalist" papers or, in terminology perhaps suggestive of an effort to be less biased in collecting and editing, "federalist and anti-federalist."

Those eighteenth-century debates occurred more than two centuries ago. Twenty-first century readers are even more removed than the lapse of time suggests from being in tune with the spirit and culture surrounding the debates over what became the Constitution of the United States and the Bill of Rights embodied in the Amendments adopted forthwith. Those debates were strikingly lively and thorough examinations of the history of peoples' ideas and efforts to form governments powerful enough to preserve the order essential to protection of individual liberty and at the same time subject to inherent controls against abuse of power likely to lead to despotism.

Ideas about liberty and order are no less relevant now than they were when the Founders developed the distinctive form of federalism that is the genius of the document we call the Constitution of the United States of America. "The aim of the American legal system is liberty and justice for all. How close we come to that aim depends on good judging." Robert E. Keeton, *Judging in the American Legal System* 1 (Lexis Law Publishing 1999).

> The quality of judging in a legal system depends on commitment. It depends, first, on commitment to the aim of justice. Second, it depends on commitment to professionalism. The declared beliefs of all professionals in the system—including advocates, counselors, and academic critics as well as judges—affect the quality of judging in the system. Third, the quality of judging depends on commitment to method. Judicial choice, at its best, is reasoned choice, candidly explained.

*Id.* at 5.

We members of the Bar, Bench, and Academies in the United States of America have long considered ourselves to be professionals in the highest and most honorable sense. I do not hesitate to say "we" in this context, since I have long been a member of the Bar, then Academies, and finally the Bench, at

each step preserving my previous sense of belonging and adding another. We have had a tradition of mutual encouragement of professionalism that places the interests in doing justice above personal interests of all kinds. It is part of this tradition that one's seeing examples of professionalism in the performance of judges and advocates encourages one's own adherence to professional standards.

> Whether or not you are a judge or ever expect to be one, it makes a difference how well you understand judging in our legal system and what you believe about commitment to the aim of justice, to professionalism, and to method in judging.

*Id.* at 7 (footnote omitted).

Have changes occurred that make us less likely now to express our sense of professionalism and less likely to attribute any credit to our eighteenth-century predecessors? I believe so, and I believe the issues presented in the case before me illustrate a need for reflection about ways in which reexamination of the thoughtful eighteenth century debates may illumine problems we confront now.

*Change the Climate, supra,* 214 F.Supp.2d at 160–161.

## D. Special Protection for Opinions

Independently of the reasoning explained thus far, courts have a role in providing special protection for opinions.

In the First Amendment context, in order to avoid undue censorship, the zone of protection given to expressions of opinion is an absolute bar to liability, so long as the expressions do not imply the existence of undisclosed defamatory facts; similarly, defamation claims by public officials are barred absent a clear and convincing showing of actual malice. *See Gray v. St. Mar-tin's Press, Inc.,* 221 F.3d 243 (1st Cir. 2000).

Defendant Swift submits that, to avoid "chilling" the free exercise of discretion in circumstances involving the balancing of competing rights and obligations by public officials, a similar standard should be applied here. Specifically, to comport with constitutional and other fundamental principles, she says qualified immunity should be recognized where a public official is required to exercise her judgment and form an opinion as to a balance between competing interests, so long as the official does not knowingly or recklessly rely upon irrelevant considerations or false information, or ignore contrary information.

Here, defendant Swift asserts that she exercised her judgment and acted on her opinion in fact-specific circumstances as to which previous cases could only have been of limited assistance as to the appropriate weighing of clashing rights asserted by the parties. Swift says no showing has been made by Mihos that Swift acted in reckless disregard of information not supporting her opinion, or relied upon irrelevant or false considerations. Accordingly, she should be protected from personal liability.

I conclude that First Amendment precedents identified in all the preceding parts of this opinion support this assertion by defendant Swift.

## E. Special Protection for One–Step Balancing Decisions

As this court has recognized earlier in this opinion, the actions taken by Swift in discharging Mihos from his position as Turnpike Commissioner were within the scope of actions protected by the First Amendment. The expressive elements of Swift's actions arise out of the exercise of her discretion in performing her duties as the Acting Governor of the Common-

wealth. Swift was required to exercise that discretion because she was faced with what she perceived to be, among other things, gross fiscal irresponsibility on the part of the plaintiff.

This fact is of central importance to the resolution of this case, and, as Swift contends, to the appropriate standard for deciding claims of qualified immunity (under which she cannot be held personally liable for damages in this case). *Pickering v. Bd. of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) (discharge of public employee for First Amendment activity involves balancing of speech interest against state interest in efficient effective government); *Mullin v. Fairhaven*, 284 F.3d 31, 37 (1st Cir.2002) (public official's First Amendment right in vote subject to balancing test). The standard for deciding issues concerning a public official's qualified immunity ordinarily turns on whether the right in question "was clearly established when the harm-inducing conduct allegedly took place." *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). But in some circumstances the showing necessary to meet the "clearly established" standard is not certain, and especially is this so when a balancing test is involved. Thus, in *Frazier v. Bailey*, 957 F.2d 920, 931 (1st Cir.1992), the First Circuit held that where a right is "subject to a balancing test, the right can rarely be considered 'clearly established,' at least in the absence of closely corresponding factual and legal precedent."

Here, the "clearly established" standard provides little guidance to the court because defendant Swift was charged with the important duties of governing, while also being required to strike a balance between plaintiff's rights and her own fundamental obligation to ensure the effective functioning of government. If this uncertainty were enough to bar a public official from receiving the benefit of qualified immunity, then qualified immunity would fail of its "central purpose ... to protect [public officials] 'from undue interference with their duties and from potentially disabling threats of liability.'" *Elder v. Holloway*, 510 U.S. 510, 514, 114 S.Ct. 1019, 127 L.Ed.2d 344 (1994) (citation omitted).

## VIII. The Law Affords Protections for Freedom of Action

Consider also freedom of action, not just freedom of expression. The First Amendment does extend some protection to freedom of action, but other sources of protection of freedom of action are also important.

Other sources of guidance explain that freedom of action is highly valued even apart from explicit or implicit communicative content of nonverbal actions.

We are accustomed to thinking of the First Amendment primarily, though not exclusively, in relation to claims for freedom of expression, freedom in choices about religious beliefs and practices, and separation of church and state. In fact, however, the First Amendment, and as well other principles of constitutional dimension, support freedom of action as well as expression. They do so not only because non-verbal action is often explicitly or implicitly expressive of a point or points of view. They do so also because of the high value the American legal system places on freedom of action quite apart from any explicit or implicit expression. Freedom to do what we want to do as well as say what we want to say was a core influence on the thinking of supporters of the American Revolution. *See* Part VII, above.

These points lead to the formulation of Proposition Eight. I include in this proposition an idea that these freedoms are lim-

ited by the aim of the American legal system for equal justice under law.

*Proposition Eight.* The American legal system affords legal protection for doing what we want to do as well as saying what we want to say. This freedom is limited by like freedom of every other person. The interests of all persons in freedom may be overridden by compelling governmental interests such as those that threaten the very survival of the government after a formal declaration of war or an exigent comparable threat.

## IX. Freedom of Action and Expression Is Protected Also By Legal Recognition That Some Transactions Are Beyond Law

Some transactions are beyond law. This is true for two independent sets of reasons. *First.* As a practical matter, in human affairs, involving as they do interactions of all kinds (including social, economic, and political), it is impossible to detect and effect sanctions against all violations of law, even if lawmakers wish the universe were otherwise. *Second.* Lawmakers often choose, as a matter of wise resource allocation, not to incur the expense and the resulting intrusions on freedom of action and expression that would follow if the law purported to regulate all transactions. The American legal system does not aim for such comprehensive regulation of American society because of the high value we place on freedom of action and expression.

To understand law well, we need to understand its functions and limits. We need to know both the scope of its reach and the nature of things beyond its reach. We need to understand the other institutions that contribute, along with law, to achieving a social, cultural, and political order, and to understand the relationships among law and these other institutions and methods of influ-

encing and controlling human behavior to make a civilized society possible.

No legal system has ever, or will ever, achieve total control over the relationships and events occurring within its geographic area. The effective reach of law and of the legal system that provides for its enforcement is never universal.

The reach of law depends in part on effective enforcement, even in a community strongly committed to respect for law. Enforcement of law depends on the actions of individual human beings to whom official responsibilities are assigned, formally or informally. Their human failings cause even the most determined efforts at enforcement to fall short of the goal. Always, some mandates of the law remain unenforced, and to some degree unenforceable. In short, some things are beyond law, by necessity.

Keeton, *Judging in the American Legal System,* pp. 129–30 (2000). *Change the Climate, supra,* 214 F.Supp.2d at 164–65.

These principles lead to recognition of another proposition that is stated here as Proposition Nine.

*Proposition Nine.* Another source of protection for freedom of action and expression exists in American society because the American legal system recognizes that some transactions are beyond law.

## X. Dismissal of Claims By Mihos Against Defendant Galvin

Plaintiff's complaint, filed in a court of the Commonwealth before the case was removed to this court, named Galvin as a defendant only in his official capacity, as Secretary of the Commonwealth of Massachusetts. This is a recognized way of suing the Commonwealth. *Will v. Michigan*

*Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989).

During proceedings before this court, plaintiff filed a notice of voluntary dismissal of all claims against Galvin, and at the Case Management Conference of December 10, 2002, confirmed his intent by stating that he has no objection to dismissal of federal-law claims with prejudice. Galvin accepted this as a final agreement, stating also that he would not seek attorneys' fees or costs.

## XI. Plaintiff's Objections to the Court's Ordering Final Judgment

In the Case Management Conference of November 26, 2002, the court gave notice to the parties that it was seriously considering ordering separate final judgment as to (1) all of the claims of Mihos as plaintiff seeking reinstatement and other relief (to the extent decided in his favor in this court's opinion of October 29, 2002) for Swift's discharging him from his position as Turnpike Commissioner, and (2) all of the defenses of Acting Governor Swift to the claims of Mihos for punitive damages and for damages for defamation. The court also invited submissions from the parties bearing on whether, in addition, the court could properly decide, as matters of law are decided, one or all of the remaining claims of Mihos against Swift for compensatory damages.

Both in his written submissions and at oral argument on December 10, 2002, counsel for Mihos objected to the court's deciding, as matters of law are decided, any of the issues of damages—punitive damages, damages for defamation, compensatory damages, and attorneys' fees. On behalf of Mihos, he asserts that the court cannot properly decide anything as matters of law are decided unless and until a motion for summary judgment is filed by either Mihos or Swift.

Counsel for Mihos also argues that if the court decides the entire case now it takes away the victory the court, in the Opinion and Order of October 29, 2002, declared that Mihos deserves. In fact, this is not so. Mihos has in fact been reinstated to the position from which he was discharged, and his lost pay has been fully restored. This restoration and the declaratory relief already awarded add up to a very significant victory. It is simply not correct that a final judgment now in the entire case would deprive him of his deserved victory.

I conclude, instead, that just as it was appropriate for this court to decide as matters of law are decided for plaintiff Mihos to the extent that this court did in its decision of October 29, 2002, so too is it appropriate for the court to decide the issues that are decided in this opinion as matters of law are decided. The grounds of decision explained for each of the matters decided in this opinion make further proceedings both unnecessary and inappropriate. As explained in Part III of this opinion, the protections of qualified immunity for public officials extend not only to protections against judgments for damages but also to protections against the burdens of litigation. Plaintiff has failed to show that any of the discovery that he seeks would produce evidence creating a genuine dispute of fact that would be material to the outcome of this case. In these circumstances, I conclude that it is appropriate to order final judgment now, giving the parties the opportunity to file appeals promptly and thus enable the Court of Appeals to order that these appeals be consolidated with the appeal from my Opinion and Order of October 29, 2002, if it so chooses.

## XII. Costs and Attorneys' Fees

### A. Introduction

Under Rule 54 of the Federal Rules of Civil Procedure, a United States district

court is allowed to exercise discretion to a prescribed extent about awards of costs and attorneys' fees. Ordinarily, costs other than attorneys' fees are to be allowed "to the prevailing party." Fed.R.Civ.P. 54(d)(1). But this rule adds, "unless the court otherwise directs." *Id.*

## B. Costs as Between Mihos and Swift

In the present case, I find that neither Mihos nor Swift is "the prevailing party" in a sense warranting an award of costs. Each has shown an entitlement to very substantial relief, but each has also failed to prevail on a very substantial part of the total position asserted in the case.

Costs are not awarded to either Mihos or Swift.

## C. Attorneys' Fees Claimed by Mihos

Other parts of Rule 54 may be relevant to the claims of Mihos for an award of attorneys' fees.

(A) Claims for attorneys' fees and related non-taxable expenses shall be made by motion unless the substantive law governing the action provides for the recovery of such fees as an element of damages to be proved at trial.

(B) Unless otherwise provided by statute or order of the court, the motion must be filed and served no later than 14 days after entry of judgment; must specify the judgment and the statute, rule, or other grounds entitling the moving party to the award; and must state the amount or provide a fair estimate of the amount sought. If directed by the court, the motion shall also disclose the terms of any agreement with respect to fees to be paid for the services for which claim is made.

(C) On request of a party or class member, the court shall afford an opportunity for adversary submissions with respect to the motion in accordance with

Rule 439e or Rule 78. The court may determine issues of liability for fees before receiving submissions bearing on issues of evaluation of services for which liability is imposed by the court. The court shall find the facts and state its conclusions of law as provided in Rule 52(a), and a judgment shall be set forth in a separate document as provided in Rule 58.

(D) By local rule the court may establish special procedures by which issues relating to such fees may be resolved without extensive evidentiary hearings. In addition, the court may refer issues relating to the value of services to a special master under Rule 53 without regard to the provisions of subdivision (b) thereof and may refer a motion for attorneys' fees to a magistrate judge under Rule 72(b) as if it were a dispositive pretrial matter.

(E) The provisions of subparagraphs (A) through (D) do not apply to claims for fees and expenses as sanctions for violations of these rules or under 28 U.S.C. § 1927.

Fed.R.Civ.P. 54(d)(2).

Serious problems of interpretation arise from the curious failure of Rule 54(d)(2) to make any cross-reference to any specific source of "substantive law" guidance for determining an entitlement to attorneys' fees.

Subdivision (A) does explicitly state a procedural requirement of the filing of a "motion unless the substantive law governing the [civil] action provides for the recovery of such fees as an element of damages to be proved at trial."

Subdivision (B) details other procedural provisions that apply unless "otherwise provided by statute or order of the court." This reference to an "order of the court," in context, introduces another opportunity

and responsibility for the court to exercise discretion.

Still more procedural mandates, issues, and occasions for the trial court to exercise discretion are introduced by subdivisions (C), (D), and (E).

All things considered, I find no guidance in Rule 54(d)(2) for the critical issues regarding attorneys' fees that I must decide in this case.

Mihos did obtain as part of the judgment in the state-court case an award of attorneys' fees incurred in that action. He has failed to show, however, that he is entitled to have that award incorporated into the judgment of this civil action in this United States district court. Also, he has failed to show that he is entitled to have an award of attorneys fees incurred for representation in the hearing before Acting Governor Swift incorporated into the judgment in this civil action in the United States district court. I conclude that these claims by Mihos are barred by the First Amendment and other protections against an award of damages for the good faith performance of public duties by the Acting Governor of the Commonwealth. This result follows from the law's protections of freedom of action and expression explained in this opinion.

### D. Things Judgments May Say and Private Individuals May Do

Judgments may say many things that ordinarily judges and the attorneys who are asking judges to do things in judgments do not bother to think about until the case is almost concluded. Probably the most common of those things concerns prejudgment interest. Failure to think about prejudgment interest until after judgment has been ordered by the judge and entered by the clerk is almost certain to create confusion afterwards. But this is not the source of confusion in the present case. The issues here are whether to award costs and attorneys' fees.

I am sensitive to the proposition, as explained in Parts III and VII(B) and (E) of this opinion, that a governor should not leave office in debt because the governor has been willing to be an energetic, strong, and committed governor. But nothing in the order that the court makes awarding no attorneys' fees and costs to either as between Mihos and Swift will prohibit private individuals from making contributions protecting a party from having to bear this burden personally. The relevant burden is not only the burden of attorneys' fees and costs. That burden is small in this instance, compared with other burdens on one who loses. The relevant burden extends also to a larger burden that in fact could not be recompensed by an award of costs and attorneys' fees.

It is reasonable to expect that some private contributors, knowing that it is permissible under the court's order to do so, will be willing to make contributions to help relieve the burden on a departing governor, or Turnpike Commissioner, who has rendered creditable service to the public by standing fast in the assertion of deeply held convictions.

### ORDER

For the foregoing reasons, it is ORDERED:

The clerk is directed to enter forthwith on a separate document a Final Judgment as follows:

(1) Plaintiff, Christy Peter Mihos, is awarded the following declaratory relief: It is hereby declared that Acting Governor Jane M. Swift, acting in her official capacity, violated his legally protected rights by retaliating against him for his voting, in his official capacity as Massachusetts Turn-

pike Commissioner, contrary to her communicated wishes.

(2) All claims of Mihos for damages and for any other form of relief beyond that allowed in paragraph (1) of this judgment are DISMISSED WITH PREJUDICE.

(3) No costs and no attorneys' fees are awarded to either Mihos or Swift against the other.

(4) The federal law claims of Mihos against defendant William F. Galvin in his official capacity as Secretary of the Commonwealth of Massachusetts are DISMISSED WITH PREJUDICE.

### Final Judgment

For the reasons stated in the opinion of this date, it is ORDERED:

(1) Plaintiff, Christy Peter Mihos, is awarded the following declaratory relief: It is hereby declared that Acting Governor Jane M. Swift, acting in her official capacity, violated his legally protected rights by retaliating against him for his voting, in his official capacity as Massachusetts Turnpike Commissioner, contrary to her communicated wishes.

(2) All claims of Mihos for damages and for any other form of relief beyond that allowed in paragraph (1) of this judgment are DISMISSED WITH PREJUDICE.

(3) No costs and no attorneys' fees are awarded to either Mihos or Swift against the other.

(4) The federal law claims of Mihos against defendant William F. Galvin in his official capacity as Secretary of the Commonwealth of Massachusetts are DISMISSED WITH PREJUDICE.